Andrew Guidi
DELANEY  WILES  HAYES  GERETY
ELLIS  &  YOUNG,  INC.
1007 West Third Avenue, Suite 400
Anchorage, AK  99501
   (907)  279-3581
   (907)  277-1331  fax
Attorneys for Defendant
*FIRST FINANCIAL INSURANCE COMPANY, INC.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| ERIC LUTZ, as assignee  of<br>rights  of  Dean Bruington d/b/a<br>DB Enterprises,<br><br>     Plaintiffs,<br><br>v.<br><br>FIRST FINANCIAL INSURANCE<br>COMPANY,  INC.<br><br>     Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)  No.  A04-229-CV  (JKS)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## FIRST FINANCIAL INSURANCE COMPANY, INC.'S OPPOSITION TO PLAINTIFF ERIC LUTZ' MOTION FOR SUMMARY JUDGMENT

## PRELIMINARY STATEMENT

Plaintiff Eric Lutz sued his home builder, Bruington, for building a shoddy home, ultimately taking a "lay down" state court judgment against his builder.[1]  Now, Lutz seeks to manufacture insurance coverage for that judgment under a commercial general liability ("CGL") policy issued to Bruington by First Financial Insurance Company ("FFIC"). Lutz never argues that the insurance contract actually provides any coverage for his damages.  Clearly, it does not.  So rather than even arguing about coverage, Lutz urges the court to manufacture coverage through estoppel by claiming that FFIC did not deny Bruington's claim well enough.

The Lutz motion should be denied because neither the law nor the material facts concerning FFIC's conduct support imposing coverage by estoppel here.  The creation of coverage by estoppel is reserved for horrible offenses committed by an insurer against its insured that simply did not take place here.

Initially, there was no potential coverage for Lutz' claims against Bruington.  All damages were caused by the work of either Bruington or Shelton Services, an independent contractor.  But there is no coverage for any damages caused by any independent contractor or for any damages to the work of Bruington and caused by Bruington.  Further, Lutz cannot satisfy the basic coverage grant of Bruington's policy

---

[1]       The judgment was entered after Lutz and Bruington had entered into a settlement, Bruington had failed to respond to Requests for Admissions, and the resulting "admissions" were used as evidence to support Lutz' unopposed motion for summary judgment.  The amount of the final judgment was a wildly bloated sum bearing no relation to any actual damage to the home (indeed many times the full value of the home).  Challenges to the amount of judgment and process of its entry are reserved for another day, following full discovery into that clear attempt to "set up" FFIC through collusion.

(for which he holds the burden of proof) because no property damage alleged in the underlying case occurred during the FFIC policy period. Lutz's home was completed in December 1999, Bruington's policy expired in December 1999, and Lutz's house first started cracking (in Lutz's own words) in "late spring of 2000." There is no evidence whatsoever that any property damage occurred during the policy period.

Further, Lutz cannot present evidence anywhere near what courts have found sufficient to impose coverage by estoppel. Lutz constructs his estoppel argument on decisions where the insurer owed its insured a duty to defend and not only failed to defend, but committed grossly offensive acts against its insured. In one case, the insurer hired coverage counsel and reached a coverage position, but <u>never</u> told the insured of its position <u>for five years</u>. In another, the insurer decided there was probably no coverage, but instead of telling the insured, hired a coverage attorney and questioned the insureds about the facts to build a case against the insured. And it did so even though the insured was represented by counsel.

The facts here are nothing like the facts in those cases. After Bruington notified FFIC of Lutz' claim (nearly three years after the insurance contract had expired), FFIC properly investigated the claim. When it reached a coverage position, FFIC promptly told Bruington that there was no coverage and told him why through a prompt, written letter declining coverage. It asked Bruington if he had any questions and urged him to send it any further information that might impact FFIC's decision. But Bruington never questioned anything FFIC stated and never provided FFIC with any new information.

And unlike in the cases Lutz cites, FFIC did not covertly investigate facts to build a case against Bruington without telling him of FFIC's coverage position.  FFIC did not hire coverage counsel but keep its decision from its insured.  Nor did it violate an attorney-client relationship between Bruington and an attorney.  Coverage by estoppel cannot be imposed on FFIC because FFIC owed no duty to defend Bruington, because it conducted a reasonable investigation, and because it promptly, indeed correctly, denied coverage for this loss.

## FACTUAL DISCUSSION

### I.    Construction and Completion of the House

In 1999, Eric Lutz hired Dean Bruington dba DB Enterprises ("Bruington"), to build a house.[2]  Bruington is licensed as a specialty contractor (rough and finish carpentry) and not as a general contractor.[3]  Bruington contracted with M. Shelton Services, Inc. ("Shelton"), to perform some of the work on the Lutz property.[4]  Shelton is an independent excavation contractor and certified septic system installer.  It is a corporation in good standing with the State of Alaska.[5]  Shelton carries its own liability insurance for its work and equipment, files its own tax returns, and has its own

---

[2]     Complaint at ¶ 9.

[3]     Exh. A, Dean Bruington's (DB Enterprises) license as a registered Specialty Contractor.

[4]     Exh. B, Affidavit of Michael Shelton, ("Shelton Aff."), at ¶ 3.  (The original is on file with the court.  It was attached to FFIC's Motion for Summary Judgment as Exh. A (ECF #28).

[5]     *Id.* at ¶ 2.

employees.[6]  Shelton brought and used his own equipment for the job – equipment Bruington did not have.[7]  Although Shelton had previously performed contract work for Bruington, that work represented less than 1% of Shelton's business.  Shelton did not work on a Bruington job immediately before or after the Lutz site work.[8]

Shelton's principal, Mike Shelton, is a licensed contractor and the individual from Shelton who worked at the Lutz site.  He did not punch a time clock or have to maintain specific hours, other than what was necessary to coordinate work with Mr. Bruington.  At the Lutz property, Mike Shelton acted as an employee of Shelton, and not of Bruington.[9]

Bruington made its payments to Shelton Services, Inc., not Michael Shelton. There were no payroll deductions, such as for social security, medicare or unemployment. And Shelton was not given a W-2.[10]  Bruington provided Shelton with general directions as to where to excavate and the depth.  Brunington also provided a foundation plan, but not a particular design for the excavation itself.[11]

In November 1999, the house was apparently close enough to completion that Lutz and his wife moved in.[12]  Lutz admits, however, that the house was not completed until

---

[6]    *Id.* at ¶ 7.

[7]    *Id.* at ¶ 4.

[8]    *Id.* at ¶ 3.

[9]    Exh. B, Shelton Aff., at ¶ 6-7.

[10]    Exh. B, Shelton Aff., at ¶ 7.

[11]    Exh. B, Shelton Aff., at ¶ 5.

[12]    Exh. C, Complaint in *Lutz v. Bruington* at ¶ 10; Exh. D, Lutz Sworn Statement at 23-24. (The Sworn Statement of Lutz, cited to in this brief, was taken in connection with Lutz' claim against his

December 1999 and the "Notice of Completion," drafted pursuant to Alaska Stat.

34.35.071, specified that the work was completed on December 16, 1999.[13]  Lutz then

purchased homeowner's insurance in effect beginning on December 22, 1999.[14]

## II.    **Bruington's Application for Insurance From FFIC**

Bruington and FFIC were parties to a general liability insurance contract (the

"FFIC insurance contract") under which Lutz now claims (by virtue of an assignment of

Bruington's alleged rights).  On the insurance questionnaire he submitted when he applied

for this insurance, Bruington was asked the nature and description of his business and

business operations.  Bruington represented that he was a "framing contractor."[15]

Bruington then was asked to describe the type and percentage of work he subcontracted to

others, "if any."  Bruington left the section blank, representing that he subcontracted no

types of work and the percentage of work he subcontracted was zero.[16]  Bruington was

asked whether "your subcontractors carry coverages or limits less than yours," whether

subcontractors are allowed to work without certificate of insurance," and whether he

"lease[d] equipment to others with or without operators?"  To each question he answered

"no."[17]

---

homeowner's policy); Exh. E, Lutz' Brief in Support of Motion for Summary Judgment in *Lutz v. Bruington* at 3.

[13]    Exh. D, Lutz sworn statement at p. 23; Exh. F, December 16, 1999 Notice of Completion.

[14]    Exh. G, Eric & Marsha Lutz's Homeowners Policy with Umialik Insurance Company.

[15]    Exh. H, Bruington's November 16, 1998 Commercial Insurance Application at p. 1.

[16]    *Id*. at p. 2.

[17]    *Id*. at p. 2.

III.    **The FFIC Insurance Contract With Bruington**

FFIC agreed to insure Bruington, and based on this information, issued the FFIC

insurance contract.  The FFIC insurance contract contains the following relevant

provisions:

"SECTION  I - COVERAGES

COVERAGE A.  BODILY INJURY AND PROPERTY DAMAGE LIABILITY

    1.    Insuring Agreement

        a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.
        .  .  .

        b.    This insurance applies to a "bodily injury" and "property damage" only if:
        . . .

            (2)    The "bodily injury" or "property damage" occurs during the policy period."[18]

The policy period of the FFIC Insurance Contract was from December 8, 1998

through December 8, 1999.[19]

The FFIC insurance contract  includes the following relevant definitions:

    "Property damage" means "physical injury to tangible property[.]"[20]

---

[18]    Exh. I, FFIC Insurance Contract at p. 13

[19]    *Id.* at p. 4.

[20]    *Id.* at p. 25.

"Your work" means:

> "Work or operations performed by you or on your behalf;"
> . . .

"Your work" includes:

a.    "Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work'; and

b.    The providing of or failure to provide warnings or instructions."[21]

"Products-completed operations hazard" is defined as:

a.    Includes all "bodily injury" and "property damage"
occurring away from premises you own or rent and arising out of "your product" or "your work" except:

> (1)    Products that are still in your physical possession; or
>
> (2)    Work that has not yet been completed or abandoned.[22]

"Your product" means:

a.    Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

> (1)    You;
> . . .

"Your product" includes:

---

[21]    *Id.* at p. 25.

[22]    *Id.* at p. 24.

> a.   Warranties or representations made at any time
>      with respect to the fitness, quality, durability,
>      perform-ance or use of "your product."[23]

Relevant exclusions to the FFIC insurance contract include:

> K.   Damage to Your Product
>      "Property damage" to "your product" arising out
>      of it or any part of it.
>
> L.   Damage to Your Work
>
>      "Property damage" to "your work" arising out of
>      it or any part of it and included in the "products-
>      completed operations hazard."
>
>      This exclusion does not apply if the damaged
>      work or the work out of which the damage
>      arises was performed on your behalf by a
>      subcontractor.[24]

The FFIC insurance contract also included Endorsement BG-G-070 492 (the "Independent Contractor Exclusion").  At the top of the page, in all capital letters, it states:  "THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.  It then provides:

> "EXCLUSION - INDEPENDENT CONTRACTORS
>
> This endorsement modifies insurance provided under the following:
>
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
>
> This insurance does not apply to "bodily injury," [or]
> "property damage" . . . arising out of the actions of

---

[23]   *Id.* at p. 25.

[24]   *Id.* at p. 16.

independent contractors for or on behalf of any insured."[25]

The FFIC insurance contract placed duties on Bruington if a claim was made or a suit was brought against him.  It provides:

SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

    2.    Duties In The Event Of Occurrence, Offense, Claim Or Suit

    a.    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim.  To the extent possible, notice should include:

        (1)    How, when and where the "occurrence" or offense took place;

        (2)    The names and addresses of any injured persons and witnesses; and

        (3)    The nature and location of any injury or damage arising out of the "occurrence" or offense.

    b.    If a claim is made or "suit" is brought against any insured, you must:

        (1)    Immediately record the specifics of the claim or "suit" and the date received; and

        (2)    Notify us as soon as practicable.

        You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

    c.    You and any other involved insured must:

        (1)    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

        (2)    Authorize us to obtain records and other information;
            . . .

---

[25]    *Id*. at p. 33.

    d.    No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, with-out our consent.[26]

## IV    Damage to the House Occurs and Lutz Notifies Bruington

Lutz has sworn that he first noticed "anything in the house" that he attributed to any flaws in its construction in the spring of 2000 and alleged in his state court complaint against Bruington that it was not until "the late spring of 2000, [that] some minor hairline cracks had appeared in the interior plaster finish."[27] Lutz' former wife has sworn that she first observed property damage by late in the winter of 1999-2000.[28] But the insurance contract's policy period expired in 1999 before winter even began. There is no evidence of any damage to the home occurring before December 9, 1999, the close of FFIC's policy period.

In the fall of 2000, Lutz noticed cracks in the drywall and then contacted Bruington. Bruington came to the house and made repairs.[29] Although the FFIC insurance contract obligated Bruington to notify FFIC of any occurrence "which may result in a claim,"[30] and to notify FFIC "as soon as practicable" of any claim made against

---

[26]    *Id.* at pp. 20-21.

[27]    Exh. C, Complaint in *Lutz v. Bruington,* at ¶ 11; Exh. D, Lutz Sworn Statement at p. 37.

[28]    Exh. J, Marsha Henderson Affidavit. (The original is on file with the court. It was attached to Lutz's Opposition to FFIC's Motion for Summary Judgment as Exh. O. (ECF #31).

[29]    Exh. C, Complaint in *Lutz v. Bruington,* at ¶ 12; Exh. D, Lutz Sworn Statement at pgs. 37-38.

[30]    Exh. I, FFIC Insurance Contract at p. 20.

him,[31] Bruington never informed FFIC about any problems with Lutz' house or of Lutz' claim.

In the late summer or fall of 2001, Lutz again had Bruington come to the house because of further damages he had noticed.[32]  Again Bruington made repairs.[33]  Again he failed to informed FFIC of any problem with Lutz' house or of Lutz' claims.

## V.     Bruington Notifies FFIC and FFIC Investigates and Rejects the Claim

In December 2001, a freeze caused a pipe to burst, leading to a spill of several hundred gallons of Lutz' water supply.[34]  Consistently, Lutz swore in a statement he gave in connection with a claim he made to his home insurer that he did not notice property damage from cracks and freezing pipes until after that.[35]  In fact, in his complaint herein, Lutz alleges that significant cracking did not begin on his house until the "early summer of 2002."[36]

In mid-2002, after that freeze, burst pipe, and water spill, and nearly three years after expiration of the FFIC insurance contract, Lutz notified Bruington of allegedly serious defects in his house.[37]  This time, Bruington notified FFIC of Lutz' claim through

---

[31]   *Id.* at p. 20.

[32]   Exh. D, Lutz Sworn Statement at p. 53.

[33]   *Id.* at p. 53-54.

[34]   *Id.* at pp. 67-70.

[35]   *Id.* at pp. 48-49, 53, 67-68.

[36]   Complaint at ¶ 13.

[37]   Exh. D, Lutz Sworn Statement at p. 62.

his broker.  FFIC retained Northern Adjusters, Inc. to investigate the facts of the claim

and it did so.  David Buness, whom Northern Adjusters, Inc. employed to investigate

Bruington's claim in 2002, found no evidence of the existence of any property damage

before the spring of 2000.[38]  And when Buness met with Lutz, Lutz never claimed that

any property damage had existed before the spring of 2000.[39]  In August 2002, Northern

Adjusters forwarded the results of its investigation to FFIC.  Then FFIC informed

Bruington in writing that the defects were not covered under the express terms of the

FFIC insurance contract and set forth the policy provisions that supported its denial.

FFIC's letter told Bruington that if he had any questions, to feel free to ask, and then

asked Bruington that if he had "any additional information that may impact [its] position

in this matter" to please forward it to FFIC.  Bruington never provided FFIC with

anything further.[40]

## VI.    Lutz Sues Bruington and Obtains an Assignment of the Insurance Contract

In May 2003, Lutz filed a lawsuit in state court against Bruington.[41]  The

complaint set forth claims for breach of warranties and for misrepresentation, based on

---

[38]     Exh. K, Affidavit of David Buness ("Buness Aff.") at ¶¶ 2, 5.  (The original is on file with the
court.  It was attached to FFIC's Motion for Summary Judgment as Exh. K (ECF #28).

[39]     *Id. at ¶ 5.*  Buness arbitrarily ascribed the date of loss as October 30, 1999 in his investigatory
report based on the date Lutz told him construction was completed. *Id*.

[40]     Complaint at ¶ 13-17; Exh. L, September 11, 2002 letter from First Financial to Dean Bruington.

[41]     Exh. C, Complaint in *Lutz v. Bruington*.

assurances of Bruington that he would cure the defects in the Lutz house.[42]  It sought

nothing potentially covered.  It plainly alleged that damages were to the work product of

Bruington and were caused by Bruington and Shelton.  And it made no allegation of

physical damage to property during the policy period.

Pursuant to his duties under the FFIC insurance contract, Bruington was obligated

to "[i]mmediately send [FFIC] copies of any demands, notices, summonses or legal

papers received in connection with the claim or suit."[43]  But all he sent FFIC was a notice

of jury demand.  Bruington did, however, promise to send FFIC "any further information

we receive," as required under the insurance contract.[44]  He never did.

Lutz and Bruington then settled their differences.  In April 2004, they entered into

an "Agreement and Release" and an "Assignment of Claim and Right" whereby Lutz

released Bruington from any personal liability in exchange for Bruington performing

restitution and granting Lutz an assignment of any rights he had under the FFIC insurance

contract.[45]  With nothing at stake in the Lutz lawsuit, Bruington did not defend himself

but instead "rolled over."  He did not respond to requests for admissions and they were

deemed admitted.  Then, with those admissions as evidence, Lutz won an unopposed

motion for summary judgment.[46]   The amount of the ultimate judgment in that

---

[42]     *Id.* at pp. 6 and 9.

[43]     Exh. I, FFIC Insurance Contract at p. 21.

[44]     Exh. M, Bruington's May 13, 2003 fax to FFIC.

[45]     Exh. N, Agreement and Release; Exh. O, Assignment of Claim and Right.

[46]     Exh. P, Order Granting Unopposed Motion for Summary Judgment.

non-adversarial proceeding was a wildly bloated sum bearing no relation to any actual damage to the Lutz house.

## **ARGUMENT**

Lutz never even agues that the FFIC insurance contract covers Bruington for damages to the Lutz house. And clearly it does not. The policy language clearly and unambiguously provides no such coverage for multiple reasons. Instead, Lutz tries to manufacture coverage, as an assignee, by attempting to paint FFIC's fact investigation as wrongful and then claim that coverage should be created by estoppel. Lutz is wrong for numerous reasons.

First, FFIC's fact investigation was proper and its denial letter was timely. It correctly told Bruington that there was no coverage and told him the reasons why. Bruington could not have believed that FFIC thought otherwise, or wondered what FFIC's conclusion was.

Second, the law does not support a finding of estoppel. The creation of coverage through estoppel is rightly reserved under the law for when a duty to defend has been breached, the insurer commits extreme misconduct in its handling of claim, and the insurer commits horrible offenses against the insured, situations far different than here.

## I.     **The FFIC Insurance Contract Did Not Potentially Cover Bruington**

As discussed more thoroughly in FFIC's memorandum in support of its own motion for summary judgment (ECF # 28), the FFIC insurance contract did not potentially cover Bruington for the Lutz claim. First, all damages caused by the work of

Bruington or any independent contractor are clearly excluded – and all damages to Lutz'
house were caused by one or the other.  Second, the policy period expired on December
8, 1999 and there is no evidence that any property damage (defined as "physical injury to
tangible property") occurred before that date.

### A.    There Was No Potential Coverage Because All Damages Were Caused by the Work of Bruington Or An Independent Contractor

Under the "your work" exclusion in the FFIC insurance contract, all damage to
Bruington's work, caused by the work of Bruington, including all related work and
operations, warranties, and representations, are excluded from coverage.[47]  Bruington was
contractually obligated to build the house Lutz hired him to build, and the risk of failing
to do so falls to Bruington, not his insurer FFIC.  A CGL insurance contract such as
FFIC's here does not guarantee the insured's contractual work performance.  A builder
may purchase a performance bond from a surety to guarantee its contractual performance,
but that is not the role of a CGL insurance contract.[48]

### 1.    The "Your Work" Exclusion Bar's Lutz's Claim

By the clear language of the "Your Work" exclusion in the FFIC insurance
contract (Exclusion L) and the related definition of "your work," the contract does not

---

[47]    Exh. I, FFIC Insurance Contract, at p. 25.

[48]    *See e.g., L-J, Inc. v. Bituminous Fire & Marine Ins. Co.*, 2005 S.C. LEXIS 270, **7, 11-12 (S.C. 2005) (attached as Exh. Q) (to find faulty workmanship covered "would make a liability policy more like a performance bond, which guaranteed the work, rather than like an insurance policy, which was intended to insure against accidents"); *New Hampshire Ins. Co. v. Vieira*, 930 F.2d 696, 702 (9th Cir. 1991) (resisting argument that would transform liability insurance into performance bond). Thus, most CGL insurance contracts (like the FFIC Insurance Contract here) contain exclusions to "eliminate coverage for the cost of repairing the insured's own work, which is considered a business risk of the contractor." *Golden Eagle Ins. Co. v. Travelers Companies*, 103 F.3d 750 (9th Cir. 1996), rev'd in part on other grounds, *Government Empl. Ins. Co. v. Dizol*, 133 F.3d 1220 (9th Cir. 1998).

cover any "property damage" to the home Bruington built that arose out of the work of Bruington. The contract specifically states that coverage "does not apply to 'property damage' to 'your work' arising out of it or any part of it."[49] It defines "your work" to mean "work or operations performed by you or on your behalf" and includes as part of the definition "warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work.'"[50]

Three times, the Alaska Supreme Court has examined insurance contracts with virtually identical language and found that liability for damage to the insured's work that is caused by the insured's own work is unambiguously excluded.[51] In *Colver*, the Alaska Supreme Court found that the exclusion unambiguously applied to damages arising from work performed by the insured.[52] Similarly, in *ALPAC*, where the insured was a general contractor, the Court found the issue to be straightforward: If the work was performed by the insured, then it was not covered. But if it was not performed by him, or the damage could not fairly be attributed to his work, then the exclusion would not apply.[53] The insurance contract in *Fejes*, had a different exclusion which led to a consistent result. There, the insured's contract excluded work performed by the insured, but work

---

[49]     Exh. I, FFIC Insurance Contract, at p. 16.

[50]     *Id.* at p. 25.

[51]      *See U.S. Fire Ins. Co. v. Colver*, 600 P.2d 1 (Alaska 1979); *Alaska Pacific Insurance Co. v. Collins*, 794 P.2d 936 (Alaska 1990) *("ALPAC")*; *Fejes v. Alaska Insurance Company, Inc.*, 984 P.2d 519 (Alaska 1999).

[52]     *Colver*, 600 P.2d at 3.

[53]     *ALPAC*, 794 P.2d at 943.

performed "on behalf of a named insured" was <u>not</u> excluded.[54]  The Alaska Supreme Court recognized that the exclusion "remove[d] coverage as to property damage or work performed by the named insured," but properly held that damages caused by the operations of a subcontractor were not excluded under the language it had before it.[55]

These decisions support the conclusion that the "your work" exclusion means what it says.  A CGL insurance contract is not a performance bond.  The builder is responsible for its own work, and cannot shift the risk of its own shoddy workmanship or defective work product to its liability insurer.[56]  Indeed, Lutz does not appear to argue otherwise. He has represented that in this lawsuit, it "is not Bruington's work that is in issue, it is his subcontractor's work.  Specifically, it is the site preparation work performed by subcontractor Mike Shelton."[57]

---

[54]      *Fejes*, 984 P.2d at 525.

[55]      *Id.*  Unlike the contract in *Fejes*, the FFIC Insurance Contract also excludes damages caused by work performed by independent contractors.

[56]      Those Alaska decisions applying the "your work" and other business risk exclusions are amply supported by overwhelming national case authority, far too voluminous to cite.  The rationale for those exclusions was described at some length in the seminal decision of the New Jersey Supreme Court (applying an older policy form) in *Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788, 791-794 (N.J. 1979).  The *Weedo* court explained that the standardized CGL provisions intend to convey, through the business risk exclusions, that the risk of replacement or repair of faulty goods and works is a non-covered business expense to be borne by the insured-contractor.  "The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property <u>other than to the product or completed work itself</u>."  *Id.* at 791 (emphasis added, internal quotes omitted).  *See e.g., Nabholz Const. Corp. v. St. Paul Fire and Marine Ins. Co.*, 354 F. Supp.2d 917, 922-923 (E.D. Ark. 2005) (CGL policy is different than a performance bond and does not cover "economic damages" in connection with subcontractor's faulty work); *NAS Surety Group v. North Am. Specialty Ins. Group*, 271 F.Supp.2d 776, 781-782 (M.D.N.C. 2003) ("contractor's failure to conform its work product to contract specifications is properly remedied by performance bond, not CGL policies"); *Auto-Owners Ins. Co. v. Reliance Ins. Co.*, 227 F.Supp. 2d 1248, 1261-1262 (M.D. Fla. 2002) (same); (*Commerce Inc. Co. v. Betty Caplette Builders, Inc.*, 647 N.E. 2d 1211, 1214 (Mass. 1995) (same); *Western Employers Ins. Co. v. Arciero & Sons, Inc.*, 146 Cal. App.3d 1027, 1028-1031 (Cal.App. 1983) (same).

[57]      Lutz Opp. To FFIC's Motion for Summary Judgment (ECF # 31) at p. 8.

**2.    The "Independent Contractor" Exclusion Bar's Lutz' Remaining Claims**

The "your work" exclusion contained in many typical CGL coverage forms, including FFIC's bare form here, contain an exception to the "your work" exclusion for work performed on behalf of the named insured by a subcontractor.  But the express exclusionary endorsement to the FFIC policy bought by Bruington, the "Independent Contractors Exclusion," eliminates that coverage.  With that provision, FFIC and Bruington contractually agreed that there would be no liability insurance coverage for Bruington for any damage, whatsoever, arising from the work of independent contractors, whether any such damage was to Bruington's work or otherwise.  The policy excludes coverage for all property damage "arising out of the actions of independent contractors for or on behalf of any insured."[58]

When Bruington applied for insurance with FFIC, he was asked about subcontractors that he might use in his business.  For example, he was asked "do your subcontractors carry coverages or limits less than yours?"  Bruington answered "no." Then he was asked "Are subcontractors allowed to work without certificate of insurance?"  He answered "no."  Then he was asked "does applicant [Bruington] lease equipment to others with or without operators?"  He answered "no."  Bruington then asked to describe the type of work and percentage of work he subcontracted, "if any." Bruington left a blank answer, representing that he subcontracted no type of work and the percentage of work he subcontracted was zero.[59]

---

[58]    Exh. I, FFIC Insurance Contract,  at p. 33.

[59]    Exh. H, Bruington's November 16, 1998 Commercial Insurance Application at p. 2.

-18-

Further, Bruington was asked about the nature and description of his business and business operations in his insurance application. Bruington represented that he was a "framing contractor."[60] And it was true that Bruington was only licensed as a specialty contractor (rough and finish carpentry), and not as a general contractor.[61] Alaska Statute 08.18.171 (7) defines "general contractor" to mean "a contractor whose business operations require the use of more than three trades or the use of mechanical or specialty contractors and subcontractors who are under the supervision of the contractor." Alaska Statute 08.18.024 defines "specialty contractors" and allows them to perform the work of not more than three trades. It does not permit them to subcontract any work. Thus, Bruington legally could not "subcontract" with anyone.

Based on the law, Bruington could not subcontract, and based on this representations to FFIC, he did not use subcontractors. Thus, FFIC eliminate any possible coverage for the work of any independent contractor through a policy endorsement. In so doing, it chose to undertake no responsibility for any damages caused by independent contractors it had not underwritten. This was FFIC's right. It is well established that "an insurance company has the right to limit the coverage of a policy issued by it and when it has done so, the plain language of the limitation must be respected."[62]

Moreover, it is well-established that "when a rider or endorsement modifies,

---

[60]     Exh. H, Bruington's November 16, 1998 Commercial Insurance Application at p.1.

[61]     Exh. A, Dean Bruington's (dba DB Enterprises) license as a registered Specialty Contractor.

[62]     *Bear Fritz Land Co. v. Kachemak Bay Title Agency*, 920 P.2d 759, 761 (Alaska 1996).

qualifies, or restricts the terms of the original policy, the rider or endorsement controls.[63] The very reason an endorsement is used in any policy is to override part or all of an included form.  And that is why the endorsement adding the "Independent Contractors Exclusion" states at the top of the page, in all capital letters:  "THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.[64]  This endorsement eliminates (and is broader than) the subcontractor exception in the "your work" exclusion.

The meaning of "independent contractor" is clear.  Black's Law Dictionary defines it as "one who is hired to undertake a specific project but who is left free to do the assigned work and to choose the method for accomplishing it."[65]  Under that definition, the "relative nature of the work test" used by Alaska courts,[66] and the undisputed evidence, there is no dispute that M. Shelton Services, Inc., the only contractor who's work Lutz asserts is at issue here, was an independent contractor.

Shelton is a corporation in good standing with the state.  It conducts business independently on a variety of jobs for a variety of contractors with only about 1% of its

---

[63]     *Couch on Insurance 3d*, § 21:22 (attached hereto as Exh. R).  *See e.g., Illinois Farmers Ins. Co., v. Adams*, 144 F.3d 1129, 1131 (7th Cir. 1998); *Burak v. Great American life Ins. Co.*, 836 F.2d 1287, 1290 (10th Cir. 1988), *cert. denied*, 488 U.S. 828 (1988), *St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co*., 655 F.2d 521, 524 (3d Cir. 1981).

[64]     Exh. I, FFIC Insurance Contract at p. 33.

[65]     *Black's Law Dictionary* at 774 (7th ed. West 1999).

[66]     *See e.g., Odsather v. Richardson*, 96 P.3d 521, 523 (Alaska 2004).  Under *Odsather*, the test of whether one is an independent contractor or an employee is a multi-factor test which looks at (1) the character of the claimant's work or business; and (2) the relationship of the claimant's work or business to the purported employer's business.   The first test has three factors: (1) the degree of skill involved, (2) whether the claimant holds himself out to the public as a separate business, and (3) whether the claimant bears the accident burden.  The second test also has three factors: (1) extent to which claimant's work is a regular part of the employer's regular work, (2) whether claimant's work is continuous or intermittent, and (3) whether the duration of the work is such that it amounts to hiring of continuing services rather than a contract for a specific job.

-20-

work through Bruington.  The corporation's principal was a licensed contractor.  Shelton was retained to handle one relevant aspect of the construction of Lutz' house.  He brought his own heavy equipment to perform his work at the site.  He was paid by the contract, not as an employee, and there were no employee benefits or any required withholding. When his work was completed, he left to work on projects unrelated to Bruington.  He was not working for Bruington before this contract and did not work for him afterwards. Nor did he work exclusively for Bruington.[67]

As an independent contractor, all damages caused by Shelton's work are excluded from coverage by the "Independent Contractor" endorsement.[68]  The language of that endorsement is straightforward and clear:  It states that the insurance contract does not apply to bodily injury, property damage, personal injury, or advertising injury (as those terms are defined) arising out of the actions of independent contractors for or on behalf of any insured.[69]  Courts that have considered this, or substantially similar language, have found that it unambiguously excludes coverage for all damages originating out of the work or operations of an independent contractor.

For example, in *Mount Vernon*,[70] Future Tech, who had been hired as a subcontractor for a renovation project, subcontracted part of its work to Carmara Construction.  The insurance contract covering Future Tech included an exclusion for the

---

[67]     Exh. B, Shelton Aff., at ¶¶ 2-7.

[68]     Exh. I, FFIC Insurance Contract, at p. 33.

[69]     *Id.* at p. 33.

[70]     *Mount Vernon Fire Ins. Co. v. Future Tech Const. Corp.*, 1997 U.S. Dist. LEXIS 10799 (S.D.N.Y. 1997), attached hereto as Exhibit S.

work of independent contractors with virtually the same language as the FFIC insurance contract.[71]  The United States District Court found that the language of the "independent contractors" exclusion had "consistently been interpreted to be clear and unambiguous" and the only question before it was whether Carmara Construction was an independent contractor.[72]  Using the same definition as in the fifth edition of Black's Law Dictionary, it held that while Carmara was a subcontractor, it also was an independent contractor. Thus, the exclusion applied and summary judgment was appropriate.[73]

Because the Independent Contractors endorsement excludes coverage of any damages caused by the work of an independent contractor, the FFIC insurance contract did not potentially cover Bruington for any damages caused by Shelton or by any other independent contractor.  Because all of the allegedly defective work damaging Lutz's house was performed by either Bruington (invoking the "your work" exclusion) or Shelton (invoking the "independent contractor" exclusion), there was no potential coverage for any damage claimed by Lutz in his lawsuit against Bruington.

---

[71]    The language in *Future Tech* was: "this policy shall not apply to Bodily Injury, Personal Injury or Property Damage arising out of operations performed for any insured by independent contractors or acts or omissions of any insured in connection with his general supervision of such operations."  *Id.* At *2.

[72]    *Id.* at **4-5.

[73]    *Id.* at **5-7.  *See also, Federal Kemper Ins. Co. v. Jones*, 777 F. Supp. 405, 409-11 (M.D. Pa. 1991) (under clear language of exclusion, there was no coverage for damages arising out of "operations performed for the named insured by independent contractors"); *Canal Indem. Co. v. Lee's Used Car Sales, Inc.*, 841 F. Supp. 775, 779-780 (S.D. Miss. 1994) (under similar independent contractor's exclusion, summary judgment granted to insurer because damages were caused by work of independent contractor); *U.S. Underwriters Ins. Co. v. Congregation Kollel Tisereth*, 2004 U.S. Dist. LEXIS 19608, **18-24 (E.D.N. Y. 2004) (attached at Exh. T) (exclusion applied to subcontractors which were independent contractors).

-22-

**B.    No Damages Occurred During The FFIC Policy Period**

As FFIC argued in its motion for summary judgment (ECF # 28), the evidence is undisputed and overwhelming that there was no physical damage during the policy period of the FFIC insured contract.  The plain language of the contract requires that for there to be any possible coverage, the damage must occur during the policy period.  The contract defines "property damage" to be "physical injury to tangible property" and the insuring agreement plainly reads that the "insurance applies to . . . 'property damage' <u>only if</u>: . . . 'property damage' occurs during the policy period</u>."[74]  Thus, the insuring agreement makes clear that the contract only extends to actual property damage occurring during the policy period – and that ended on December 8, 1999.[75]  Under the plain contract language, it is the timing of the resulting property damage, and not the time of the allegedly faulty work, that matters.  And it is "hornbook law" that the insured must show that the policy <u>was in force at the time of the loss</u> by a preponderance of the evidence."[76]  But here, there was and is no such evidence.

A similar timing requirement was applied by the Alaska Supreme Court in *Makarka*.[77]  In *Makarka*, the victims' car was struck by another vehicle, whose brakes had been worked on earlier by the insured's garage.  By the time of the accident, the garage's

---

[74]    Exh. I, FFIC Insurance Contract at 13 (emphasis added).

[75]    *Id*. at p. 4.

[76]    *Couch on Insurance 3d*, §§ 254:11, 254:37 (emphasis added) (attached hereto as Exh. R). *See e.g., Evergrow Indus. Co. v. Travelers Ins. Co.*, 37 Fed. Appx. 300, 301 (9th Cir. 2002) (insured has the "burden of establishing that the underlying suit raises claims that are potentially covered by the insurance policy"); *Collin v. American Empire Ins. Co.*, 21 Cal. App. 4th 787, 802-803 (Cal. App. 1994) ("the burden is on the insured to bring the claim within the basic scope of coverage").

[77]    *Makarka v. Great American Ins. Co.*, 14 P.3d 964 (Alaska 2000).

insurance contract had been cancelled.  Thus, the plaintiff argued that the "occurrence" under the insurance contract had happened long before the collision – when the garage worked on the brakes.

The Court rejected that argument.  Much like the FFIC insurance contract, the insurance contract in *Makarka* stated that the insurer would "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies . . ." and provided that the insurer would "cover bodily injury, property damage and losses occurring . . . [d]uring the policy period shown in the Declarations."[78] Under this language, the *Makarka* court recognized that the policy was "triggered by bodily injury or property damage for which legal damages are due" and thus, "the proper moment to measure whether coverage is in force is the moment the person seeking damages was injured."[79]  The *Makarka* court made clear that the unambiguous language of the policy specified:

> precisely what must occur and when it must occur:  Under the policy, the triggering events of coverage are  "bodily injury," "property damage" and "losses" occurring ... [d]uring the policy period.[80]

The plaintiff in *Makarka* argued that the word "occurring" was ambiguous and could relate to when the negligent act happened, rather than when the plaintiff was

---

[78]    *Id.* at 966-967.

[79]    *Id*. at 967.

[80]    *Id.* at 969.

harmed.  The court responded:

> We find nothing ambiguous in this phrasing.  "Occurring" is the present participle of the verb "to occur," which means to "come to pass[,] take place [, or] happen."  Thus, the durational restriction in the Great American policy plainly limits coverage to cases in which "bodily injury," "property damage," or "losses" "come to pass," "take place," or "happen" during the policy period.  <u>This language cannot reasonably be read as a reference to negligent acts that predate the occurrence of injury.</u>[81]

Accordingly, the *Makarka* court held that under language substantively the same as in the FFIC insurance contract, "the policy's language <u>unambiguously required the policy to be in effect when the [victims'] bodily injuries occurred, not when the [insured] committed his negligent acts.</u>"[82]

The same result is mandated here.  The FFIC insurance contract only covers " sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies."[83]  Property damage is defined as "physical injury to tangible property."[84]  And the insurance applies to property damage only if it occurs "during the policy period."[85]  Under *Makarka* and a plain reading of the contract, this unambiguously requires the policy to be in effect when the actionable "physical injury to tangible property" occurred, not at the time of the alleged negligent construction of Lutz' house.

---

[81]    *Makarka* at 969, (emphasis added).

[82]    *Id.* at 966 (emphasis added).

[83]    Exh. I, FFIC Insurance Contract. at p. 13.

[84]    *Id.* at p. 25.

[85]    *Id.* at p. 13.

The evidence is undisputed that the physical injury to Lutz' house happened long after the FFIC Insurance Contract expired on December 8, 1999.  In his state court complaint against Bruington, Lutz alleged that it was not until "the late spring of 2000, [that] some minor hairline cracks had appeared in the interior plaster finish."[86]  In his complaint in this case, Lutz alleges that significant cracking did not begin until the "early summer of 2002."[87]  Further, David Buness, whom Northern Adjusters, Inc. employed to investigate Bruington's claim in 2002, found no evidence of the existence of property damage before the spring of 2000.[88]  And when Buness met with Lutz, Lutz never claimed that any property damage had existed before the spring of 2000.[89]

In short, as Lutz himself has made clear in his judicial allegations and his own sworn statement, no property damage took place until after the policy period in the FFIC insurance contract.[90]  Thus, there was no possibility of coverage for Bruington.

Lutz has argued that the FFIC insurance contract provided the products-completed operations hazard, but never suggests how that makes any difference.[91]  It certainly does not extend any coverage beyond the policy period.  As the Ninth Circuit explained in

---

[86]     Exh. C, Complaint in *Lutz v. Bruington,*  at ¶ 11.

[87]     Complaint at ¶ 13.

[88]     Affidavit of David Buness ("Buness Aff."), attached hereto as Exhibit K, at ¶¶ 2, 5.

[89]     *Id. at ¶ 5.*  Buness arbitrarily ascribed the date of loss as October 30, 1999 in his investigatory report based on the date Lutz told him construction was completed.  *Id.*

[90]     In his state court complaint against Bruington, Lutz also claimed "mental anguish" due to the defective construction.  This could only have arisen after there was property damage and is therefore necessarily outside the policy period, as well.

[91]     Lutz Motion at p. 2.

*Merritt*,[92] the policy covers property damage "which occurs during the policy period."
And, although the completed operations provision "did extend coverage after construction
had been completed," it was "not a promise by [the insurer] to insure the property for an
indefinite time after the construction was complete.  Rather, it applies only to property
damage that occurs during its policy period.[93]

As the Seventh Circuit has explained, the completed operations provision is a
defined term, not a separate grant of coverage.  Thus, it "does not operate to provide
coverage that is not otherwise extended by the policy."  Its effect is "to extend the policy's
already-existing coverage.[94]  In accord, the Tenth Circuit properly recognized that it is
"not a coverage provision but rather is an exclusion to the CGL policy that can be
removed through additional premiums."  Thus, it could not create additional coverage
beyond that provided for in the coverage provisions.[95]  And as the Second Circuit has also
set forth, the effect of the provision is that "once work is completed by an insured,
damage that thereafter occurs to the work itself is not covered by the policy, . . .  [but]
consequential damages to property outside the work product arising from completed
operations are not excluded."[96]

---

[92]    *Aetna Casualty and Surety Company v. Merritt*, 974 F.2d 1196 (9th Cir. 1992).

[93]    *Id.* at 1199.

[94]    *Sokol & Co. v. Atl. Mut. Ins. Co.*, 2005 U.S. App. LEXIS 25672 (7th Cir., Nov. 25, 2005)
(attached as Exh. U).

[95]    *VBF, Inc. v. Chubb Group of Ins. Cos.*, 263 F.3d 1226, 1232 (10th Cir. 2001).

[96]    *Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 319 (2nd Cir. 2005),
quoting *Gulf Fleet Marine Operations, Inc. v. Wartsila Power, Inc.*, 797 F.2d 257, 260 (5th Cir. 1986).  In
his opposition to FFIC's motion for summary judgment (ECF # 31), Lutz argues under cases that were
decided under older policies with different language.  Not only was the language of the policies different
in those cases, but those policies did not include the independent contractor exclusion that is in the FFIC

In sum, Lutz now seeks to recover on a collusive "lay-down" state court judgment under an insurance contract that never even potentially covered the insured for his claim. His motion should be denied.

## III.    Imposition of Coverage By Estoppel Is Unfounded Under the Facts and the Law

Because Bruington had no potential coverage under his insurance contract, Lutz tries to manufacture coverage by attempting to paint FFIC's fact investigation and coverage denial as wrongful, and then argues that FFIC should be estopped from denying coverage. Lutz is wrong for numerous reasons. FFIC's fact investigation was proper and its denial letter was timely. The letter correctly told Bruington that there was no coverage and told him the reasons why. Bruington could not have believed that FFIC thought otherwise, or wondered what FFIC's conclusion was.

Nor does the law support a finding of estoppel. For estoppel to apply, four necessary elements must be met: "(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury."[97] Generally, absent exceptional misconduct of an insurer, those courts that extend insurance coverage where none exists based on estoppel require that the insurer, with knowledge of the facts and without reservation of rights, assumes an obligation to defend and later disclaims it. But

---

contract. Interpretation of different contractual language does not change the meaning of the language in the contract before the court here.

[97]    *O'Neill Investigations, Inc. v. Illinois Employers Ins.*, 636 P.2d 1170, 1177-78 (Alaska 1981), quoting *Bequette v. National Insurance Underwriters, Inc.,* 429 F.2d 896, 900 (9th Cir. 1970).

this result depends on a showing by the insured that it relied to its detriment on the insurer's acceptance of an obligation to defend.

Because Lutz seeks estoppel as assignee of Bruington's rights, Lutz can have no greater rights than Bruington had and must stand in the shoes of Bruington.[98]  Further, because Lutz seeks an equitable remedy through his assignment from Bruington, both his conduct and Bruington's must meet the requirement that "he who seeks equity must do equity."[99]  But neither Lutz nor Bruington even comes close.  Bruington violated his obligations by his failure to notify FFIC of Lutz' 2000 and 2001 claims.  Then when Lutz filed his state court suit, Bruington violated his duty to provide FFIC with "copies of any demands, notices, summonses or legal papers received in connection with the suit."[100]  Further, both Lutz and Bruington have unclean hands for their continuing their purported litigation against each other in state court after they had settled, resulting in a collusive judgment.

Lutz relies heavily on the decisions in *Sauer*[101] and *Lloyd's*[102] to try to create coverage where none exists through estoppel.  But the facts here are nothing like the facts in those cases.  In *Sauer*, the insurer hired an independent adjuster to investigate a claim, as did FFIC here.  But that's where any similarity ends.  In *Sauer*, a lawsuit against the

---

[98]     *Fellows v. Tlingit-Haida Regional Elec. Auth.*, 740 P.2d 428, 432 (Alaska 1987).

[99]     *See Lundgren v. Nat'l Bank of Alaska*, 756 P.2d 270, 276 (Alaska 1987); *Nat'l Bank of Alaska v. J. B. L. & K. of Alaska, Inc.*, 546 P.2d 579, 589 (Alaska 1976).

[100]    Exh. I, FFIC Insurance Contract at p. 21.

[101]    *Sauer v. Home Indem. Co.*, 841 P.2d 176 (Alaska 1992).

[102]    *Lloyd's & Inst. Of London Underwriting Cos. v. Fulton*, 2 P.3d 1199 (Alaska 2000).

insured was pending at the time of the coverage investigation.  The insurer hired coverage

counsel and reached a coverage position.  But it had its investigator close its file, and it

did so as well, without ever telling the insured its coverage position.  In fact, it <u>never</u> told

the insured of its position <u>for five years</u>.  Here, by contrast, FFIC hired an adjuster as soon

as it was notified of a claim and did not hire coverage counsel.  FFIC investigated the

facts, and when it reached a coverage position, promptly sent Bruington a letter

conveying that there was no coverage and setting forth the policy provisions supporting

the denial.  It did not keep its position secret.

　　　　Nor is this case anything like *Lloyd's*.  In *Lloyd's*, the insured tendered a claim to

the insurer.  An obvious coverage issue was recognized immediately – whether the

incident on the high seas had occurred within the coverage area.  The insurer investigated

the facts and decided that there was probably no coverage.  But rather than informing the

insured (as FFIC did), it hired a coverage attorney and had a draft reservation of right

letter prepared, but <u>did not send it to the insured.</u>  The injured party then sued the insured

and the insured obtained counsel.  The insurer continued its coverage investigation

through a private investigator hired by its own coverage counsel.  That investigator then

questioned the insureds about the facts to build a case against the insured – even though

the insured was represented by counsel – all without letting the insured even know that a

coverage decision had been made or letting his counsel know that his clients were being

interviewed.  As the trial court put it, the insurance company "continued to investigate,

covertly building a case against the insured, without the presence of counsel."  Finally,

-30-

more than a month after drafting the reservation of rights letter, the insured was informed of the insurer's coverage position.

On these extreme facts, the Alaska Supreme Court held that estoppel could be applied due to multiple flagrant violations of the insurer's duties. The Court specifically found that once an insurer has reason to believe that there are coverage issues, it cannot keep getting information from the insured without first notifying it of those issues. Further, because the insurer in *Lloyd's* "continued to investigate, covertly building a case against the insured, without the presence of counsel," it found that the insurer "had impaired the [insureds'] right to a conflict-free defense at an earlier stage of the process by precluding [the insureds'] attorney from participating during [the investigator's] interview [of the insureds] about coverage."[103] Based on these two serious violations of contract and trust, the Court found that an insurer's breach of the duty to defend was a material breach that estopped a denial of coverage unless the breach had "no adverse impact on the relationship between the insurer and the insured."[104]

These cases do not stand for the extreme proposition that a breach of the duty to defend estops the insurer from denying coverage. Estoppel was founded on highly egregious conduct far worse than a breach of the duty to defend. Alaska law has long recognized that the duties to defend and indemnify are separate contractual duties and that an insurer's breach of the duty to defend does not mandate a finding of a duty to

---

[103]    *Id*. at 1207-1208.

[104]    *Id.* at 1209.

indemnify.[105]  In fact, three years after *Lloyd's* was decided, the Alaska Supreme Court

reiterated this very principle in *Great Divide*.[106]  There, insurers had denied any duty to

defend or indemnify and, as here, the insured settled with the underlying plaintiff.  That

plaintiff then sued the insurer as an assignee.  The court found that the "insurers are not

precluded from litigating the defenses they relied on in denying coverage, or reserving

their rights to disclaim coverage, or other issues pertaining to whether they have breached

their obligations."[107]

　　　　FFIC did not breach any duty to Bruington.  FFIC hired an adjuster as soon as it

was notified of a claim and did not hire coverage counsel.  It investigated the facts, and

when it reached a coverage position, promptly informed Bruington of its decision that

there was no potential coverage and the policy provisions that supported its position.  It

asked Bruington to let FFIC know if he had any questions and to send it any information

that might impact FFIC's decision.  Bruington never asked any questions.  He never

complained.  He never provided FFIC with any new information.  And he never gave

FFIC any reason to think that its position was wrong.  In fact, it was correct.

　　　　Unlike in *Lloyd's*, FFIC did not covertly investigate facts to build a case against

Bruington without telling him of FFIC's coverage position.  Nor did it violate any

attorney-client relationship.  And once it saw that there was no potential coverage, it did

not keep its position secret.  It told Bruington there was no coverage and stated the basis.

---

[105]　　　*See e. g., Afcan v. The Mutual Fire, Marine and Inland Ins. Co.*, 595 P.2d 638, 647 (Alaska 1979).

[106]　　　*Great Divide Ins. Co. v. Carpenter*, 79 P.3d 599, 606 (Alaska 2003).

[107]　　　*Id*. at 609.

It did not hire coverage counsel, secretly decide on a lack of coverage, and then use

Bruington's required cooperation to obtain facts to build a coverage case against him.

And it did not interview Bruington outside the presence of his retained counsel.

       Lutz complains that FFIC's denial letter failed to meet some strict standard and

argues that Bruington could not tell why FFIC denied coverage from its denial letter.

Lutz seems to think that a denial letter needs a dissertation of facts, the law, and an

analysis of the insurance contract.  But that is not the law.  Rather, the "insurer must give

the insured such notice of its intention to deny liability and of its refusal to defend as will

give the insured a reasonable time to protect himself.  This notice must also provide a

reasonable explanation of the basis in the insurance policy in relation to the facts or

applicable law for denial of a claim."[108]  The reason for the notice is "to avoid prejudice to

the insured which may result from delays in the insured undertaking its own defense or

from delays in gathering evidence essential to successfully challenge the denial of

coverage or a defense."[109]  In *Jones*, because the denial letter "put plaintiffs on notice of

the grounds for denial and did not hinder them in gathering evidence to challenge the

denial of coverage," it passed scrutiny.[110]  As the *Jones* court recognized, this was far

different than in *Sauer*, where the insured was not told of the denial of coverage for five

years.  FFIC's denial letter did just as it was supposed to do – it told Bruington that FFIC

---

[108]     *Jones v. Horace Mann Ins. Co.*, 937 P.2d 1360, 1360 (Alaska 1997) (citations omitted).

[109]     *Id.*

[110]     *Id.* at 1365.

had denied the claim, it told him why, and it told him long before he could incur any

prejudice from any litigation delay.

Lutz also complains that FFIC's denial letter did not tell Bruington the facts. But

this was not a situation where the facts were obscure. Bruington knew who did the

construction and when the damages were first noticed and reported. And he knew all

about the reported extent of his construction defects. In fact, long before FFIC was ever

notified, Lutz reported the problems to Bruington, and Bruington even made repairs. And

if Bruington had ever had a question, a remote concern about coverage, or further

information, he could have taken FFIC up on its request that he contact it. He had every

opportunity to do so. But he never did.

Months later, Bruington sent FFIC a notice of jury demand (regarding the state

court suit) and promised to send FFIC "any further information we receive," as he was

required to do under the insurance contract.[111] But he never sent FFIC the complaint or

anything else. And if he had held any belief that there was any chance for a defense, one

would expect that he would write or call FFIC. But Bruington never contacted FFIC

about the lawsuit, the jury demand, a defense to the lawsuit, or anything else whatsoever.

But even if Bruington had forwarded the complaint to FFIC as he was obligated to

do, because the Lutz complaint raised no potential of coverage and introduced no new

facts, there was no duty to defend. The duty to defend arises only when the face of the

underlying complaint "alleges facts which, standing alone, give rise to a possible finding

of liability covered by the policy," or facts showing policy coverage "are known or

---

[111]    Exh. M, Bruington's fax to FFIC; Exh. I, FFIC Insurance Contract at p. 20-21.

reasonably ascertainable by the insurer."[112]  And the Lutz complaint sought nothing potentially covered.

The Lutz complaint against Bruington alleged no facts that give rise to potential coverage.  Quite the reverse.  Lutz' complaint plainly alleges that damages were to the work product of Bruington and caused by Bruington and Shelton.  And it plainly makes no allegation of tangible damage to property during the policy period.  Rather, it alleges that it was not until "the late spring of 2000, [that] some minor hairline cracks had appeared in the interior plaster finish."[113]  Further, Lutz' claimed causes of action were for breach of warranties (founded on Bruington's work) and for alleged misrepresentations that defects in the work would be cured.  None is potentially covered.  And by the time Lutz filed suit against Bruington in 2003, FFIC already had told Bruington that there was no coverage for Lutz' claims under the policy.  None of the facts concerning the potential for coverage had changed.  How could they?  That the damage to Lutz' house was caused by the work of the insured and/or independent contractors was well-understood.  And nothing could change when the tangible property damage occurred.  There is no duty to investigate claims that present no possibility of coverage.[114]  And the allegations of the complaint, as well as the known facts, raised no duty to defend.[115]

---

[112]    *Fejes v. Alaska Ins. Co., Inc.*, 984 P.2d 519, 522 (Alaska 1999).

[113]    Exh. C, Complaint in *Lutz v. Bruington* at ¶ 11.

[114]    *Continental Cas. Co. v. Richmond*, 763 F.2d 1076, 1083-84 (9th Cir. 1985) (noting that any other result would penalize the insurer for its correct judgment in denying coverage).

[115]    *Fejes v. Alaska Ins. Co., Inc.*, 984 P.2d 519, 522 (Alaska 1999).

Because FFIC did not breach any duty to defend Bruington, it cannot be estopped to deny coverage. That is the law. But even if this Court were to find that there was a duty to defend, no purported breach had any "adverse impact on the relationship between the insurer and the insured." FFIC did not undermine an attorney-client relationship. And it did not delay sending its coverage position to Bruington to obtain facts from Bruington to use later against him in a coverage dispute.

Further, other elements of estoppel are absent. Bruington was not "ignorant of the true facts." He knew all of the facts before FFIC. Nor could he have relied on FFIC's denial "to his injury."[116] Bruington cannot show any actual injury from FFIC's purported breach of duty. How could he be harmed? There was no coverage and no duty to defend. So Lutz now hypothesizes that FFIC's decision stopped Bruington from giving notice of the Lutz claim to Bruington's other insurers. The terms of any other insurance policies are not in evidence so FFIC denies their impact and any detrimental reliance of Bruington. But under those insurance contracts, Bruington must have had a legal duty to notify his insurers of any claim or suit promptly. And those contracts may well have covered damages caused by independent contractors. Or not. But it is unreasonable as a matter of law for Bruington to "rely" on the lack of coverage under FFIC's policy to justify the breach of duties he contractually owed to different companies. If Bruington owed a contractual obligation of notice to other insurers, he was at all times free to honor those by tendering the loss.

---

[116]    *O'Neill Investigations, Inc. v. Illinois Employers Ins.*, 636 P.2d 1170, 1177-78 (Alaska 1981); *Lloyd's & Inst. Of London Underwriting Cos. v. Fulton*, 2 P.3d 1199, 1207-1208 (Alaska 2000).

## <u>CONCLUSION</u>

Imposition of coverage by estoppel here would encourage plaintiffs and defendants to collude to generate a judgment without a controversy, with a goal of gaining riches from the defendant's insurer whose policy did not potential cover the loss, claiming that anything the insurer did, or did not do, was a critical violation of a duty. Indeed, that is exactly what Lutz is attempting to do here. Lutz is wrong under the facts and wrong under the law. There is no basis for estoppel. Lutz' motion for summary judgment should be denied.

DATED at Anchorage, Alaska this 13th day of January, 2006.

Respectfully submitted,

DELANEY, WILES, HAYES,
GERETY, ELLIS & YOUNG, INC.
*Attorneys for Defendant*


/s/ Andrew Guidi
Andrew Guidi
1007 West third Avenue, Suite 400
Anchorage, Alaska 99501
907-279-3581/907-277-1331
ag@delaneywiles.com
Alaska Bar No. 8312171

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 13th day of
January, 2006, FIRST FINANCIAL
INSURANCE COMPANY'S OPPOSITION
TO PLAINTIFF ERIC LUTZ' MOTION FOR
SUMMARY JUDGMENT was served
electronically and via USPS postage prepaid on:


Tim Cook, Esq.
Tcook@acsalaska.net
Attorney at Law
3901 Tiaga Drive
Anchorage, AK 99516


_____
Andrew Guidi/112364