1 of 2 DOCUMENTS

**SOKOL AND COMPANY, an Illinois Corporation, Plaintiff-Appellant, v. ATLANTIC MUTUAL INSURANCE COMPANY, Defendant-Appellee.**

No. 04-3624

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

*2005 U.S. App. LEXIS 25672*

May 3, 2005, Argued
November 29, 2005, Decided

**PRIOR HISTORY:** [*1] Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 03 C 2095. Joan Humphrey Lefkow, Judge. *Sokol & Co. v. Atl. Mut. Ins. Co., 2004 U.S. Dist. LEXIS 18517 (N.D. Ill., Sept. 14, 2004)*

**COUNSEL:** For SOKOL AND COMPANY, an Illinois Corporation, Plaintiff - Appellant: Christopher A. Kreid, METGE, SPITZER & KREID, Chicago, IL USA.

For ATLANTIC MUTUAL INSURANCE COMPANY, Defendant - Appellee: Edward M. Kay, James T. Ferrini, Melinda Sue Kollross, CLAUSEN MILLER, Chicago, IL USA; Mark E. Inbody, SELVIN WRAITH HALMAN, Oakland, CA.

**JUDGES:** Before FLAUM, Chief Judge, and KANNE and SYKES, Circuit Judges.

**OPINIONBY:** SYKES

**OPINION:**

   SYKES, *Circuit Judge*. This is an insurance coverage dispute involving spoiled peanut butter. The peanut butter in question was contained in sealed packets supplied by plaintiff Sokol and Company ("Sokol") to its customer Continental Mills ("Continental") for inclusion in boxes of Continental's cookie mix. When Continental discovered that the peanut butter had gone bad, it retrieved the cookie mix, substituted fresh peanut butter packets, and sought reimbursement from Sokol for the costs associated with the replacement. Sokol filed notice of Continental's claim with Atlantic Mutual Insurance Company ("Atlantic"), its [*2] Comprehensive General Liability ("CGL") insurer. Atlantic denied coverage, citing a number of the policy's "business risk" exclusions. Sokol then paid Continental's claim itself and sought indemnification from Atlantic under the policy. Atlantic again denied coverage and this litigation ensued.

   The district court granted summary judgment for Atlantic, holding that the insurer had no duty to defend under the policy and this automatically meant there was no duty to indemnify. For this mode of analysis the court relied on language in *Crum & Forster Managers Corp. v. Resolution Trust Corp., 156 Ill. 2d 384, 620 N.E.2d 1073, 1081, 189 Ill. Dec. 756 (Ill. 1993)*, suggesting a general rule that where there is no duty to defend under an insurance policy, there can never be a duty to indemnify. We think this was an overreading of the Illinois Supreme Court's decision. The language in question, though broad on its face, must be read in context, and this case arises in a different one. We affirm on other grounds, however. The claim at issue here

does not involve "property damage" within the meaning of the policy, and even if it did, coverage is excluded under certain of the policy's [*3] "business risk" exclusions. Summary judgment in favor of the insurer was therefore appropriate.

### I. Background

Sokol is an Illinois food products manufacturer that supplied sealed packets of peanut butter paste to Continental for inclusion in boxes of Continental's cookie mix. In late August 2001 Sokol sent a shipment of peanut butter paste to Continental. In October 2001, after the paste packets were incorporated into the cookie mix boxes and shipped to customers--but before, it seems, any cookie mix was sold to the consuming public--Continental discovered that the peanut butter was rancid. (Sokol denied the peanut butter was rancid, asserting it was simply "off taste," but this disagreement is irrelevant to the present appeal.) Continental retrieved all of the affected boxes, removed the packets of spoiled peanut butter, and substituted new paste that it acquired from a different vendor. In November 2001 Continental demanded payment from Sokol for these costs. Sokol notified Atlantic, its CGL insurer, of Continental's claim, requesting a defense and indemnification. Sokol sent Atlantic a preliminary claim summary indicating that Continental's loss was $ 61,910 but that additional [*4] expenses would likely accrue. Indeed, Continental eventually sought payment from Sokol in the amount of $ 75,441.20.

In letters to Sokol dated April 5, 2002, and June 10, 2002, Atlantic took the position that while Continental's claim amounted to "property damage" caused by "an occurrence" under the policy's main Insuring Agreement, coverage was excluded by certain of the "business risk" exclusions in the policy. Atlantic reserved its right to rely on other policy provisions or exclusions and expressly stated it was not waiving its rights or obligations under the policy. Sokol then paid Continental's demand in full and filed a claim for indemnification with Atlantic. Atlantic again declined coverage.

Sokol then sued Atlantic in Cook County Circuit Court. Atlantic, a New York corporation, removed the case to district court; shortly thereafter the parties filed cross-motions for summary judgment. The district court granted summary judgment for Atlantic, concluding that because Continental had not filed an action in court against Sokol--a "suit" in the duty-to-defend terminology of the policy's Insuring Agreement--Atlantic's duty to defend was not triggered. The court then summarily [*5] concluded Atlantic had no duty to indemnify, relying on the Illinois Supreme Court's statement in *Crum & Forster* that "where there is no duty to defend, there will be no duty to indemnify." *Crum & Forster, 620 N.E.2d at 1081*. Sokol appealed.

### II. Discussion

Under Illinois law, the construction of an insurance policy is a question of law, and the court's goal is to determine the intent of the contracting parties. *Outboard Marine Corp. v. Liberty Mut. Ins. Corp., 154 Ill. 2d 90, 607 N.E.2d 1204, 1212, 180 Ill. Dec. 691 (Ill. 1992)*. We look to the policy as a whole "with due regard to the risk undertaken, the subject matter that is insured, and the purposes of the entire contract." *Id.* Unambiguous policy language is given its "plain, ordinary, and popular meaning." *Id.* Our review is de novo.

### A. Duty to Defend/Duty to Indemnify

The CGL's basic coverage grant is contained in Section 1(a) of the Insuring Agreement, which states in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will [*6] have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

By this policy language, Atlantic assumed a duty to defend Sokol against any "suit" seeking damages for sums that Sokol became legally obligated to pay as a result of "bodily injury" or "property damage." The policy defines "suit" as "a civil proceeding in which damages because of 'bodily injury', 'property damage', 'personal injury', or 'advertising injury' to which this insurance applies are alleged." Atlantic argues, and the district court held, that Atlantic had no duty to defend Sokol against Continental's claim because Continental had not filed a "suit" for damages within the meaning of the policy's coverage grant; rather, Sokol's $ 75,441.20 payment was a voluntary payment in response to Continental's demand. *See Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 166 Ill. 2d 520, 655 N.E.2d 842, 846-47, 211 Ill. Dec. 459 (Ill. 1995) (construing an "all risks" insurance policy providing a duty to defend [*7] against "suits" but leaving the term undefined, court holds that "suits" unambiguously refer to proceedings in a court of law).

The present dispute, however, is not about the insurer's duty to defend. This is a claim for indemnification coverage, and the coverage grant pertaining to indemnification does not contain the same limiting language requiring the existence of a "suit." The district court, however, viewed the absence of a duty to defend (because there was no "suit") as automatically precluding indemnification coverage. For this proposition the court cited a passage from the Illinois Supreme Court's decision in *Crum & Forster*, which appears to state a general rule that "where there is no duty to defend, there will be no duty to indemnify." *Crum & Forster*, 620 N.E.2d at 1081. Invoking this language, the court summarily held that Atlantic had no duty to indemnify Sokol for its payment to Continental.

The district court's reliance on *Crum & Forster* was misplaced. In *Crum & Forster*, the insurers filed an action seeking a determination of their duty to defend and indemnify a group of insureds in an underlying lawsuit. *Id. at 1076*. The Illinois Supreme [*8] Court first noted that the duty to defend is broader than the duty to indemnify. The former arises "even if the facts alleged in the underlying complaint fall *potentially* within the policy's coverage," whereas the latter only arises "if the facts alleged *actually* fall within coverage." *Id. at 1081* (emphasis added). The court concluded that since the facts of the complaint filed against the insureds did not "potentially" fall within the coverages of the policies at issue, no duty to defend arose under the terms of those policies.

Having determined that the insurers had no duty to defend their insureds in the underlying action, the Illinois Supreme Court went on to explain that "in cases such as the instant case where no duty to defend exists and the facts alleged do not even fall *potentially* within the insurance coverage, such facts alleged could obviously never *actually* fall within the scope of coverage." *Id.* In the next line the language at issue here appears: "clearly, where there is no duty to defend, there will be no duty to indemnify." *Id.*

In the circumstances of this case, the district court's reliance on this last-quoted statement in *Crum & Forster* [*9] was a mistake. Both the duty to defend and the duty to indemnify were at issue in *Crum & Forster*; there was an underlying suit, and the existence of both duties turned on an examination of the facts alleged in that suit. Since the claim at issue in *Crum & Forster* did not even *potentially* fall within the scope of coverage for purposes of the duty to defend, it logically followed that the claim would not *actually* fall within the scope of coverage for purposes of the duty to indemnify.

Here, on the other hand, there is no underlying suit, the duty to defend is not at issue, and we have before us only a payment made by the insured for which it now seeks indemnification coverage. *Crum & Forster's* holding therefore does not apply. The two duties of the insurer--defense and indemnification--are distinct; while the duty to indemnify may sometimes nest inside the duty to defend, that will not always be the case. n1

    n1 The *Crum & Forster* "no duty to defend means no duty to indemnify" formula was repeated in *Zurich Ins. Co. v. Carus Corp.*, 293 Ill. App. 3d 906, 689 N.E.2d 130, 133, 228 Ill. Dec. 258 (Ill. App. Ct. 1997) (holding that since obligation to pay environmental cleanup investigation costs did not arise

from a "suit" as defined in the policy, insurer had no duty to defend and, under *Crum & Forster*, no duty to indemnify). This appears to be an anomaly. In any case, the *Carus* court also held that the facts of the claim did not trigger the separate duty to indemnify because the insured's contamination investigation expenses were incurred voluntarily; no entity ever made a claim against Carus that it was legally obligated to pay. *Id. See also Cent. Ill. Light Co. v. Home Ins. Co., 213 Ill. 2d 141, 821 N.E.2d 206, 212-18, 290 Ill. Dec. 155 (Ill. 2004)* (in case construing an excess insurance policy in which no duty to defend was included, court holds that the duty to indemnify costs for which the insured becomes "liable to pay . . . as damages" can be triggered in absence of lawsuit or other legal action).

[*10]

### B. Indemnification Coverage Under Insuring Agreement

As we have noted, under the terms of the Insuring Agreement, Atlantic's duty to indemnify is not limited to "suits." The policy provides that Atlantic "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The question of indemnification coverage thus turns on whether the payment Sokol made to Continental qualifies as a sum that Sokol became "legally obligated to pay as damages because of 'bodily injury' or 'property damage.'"

The spoiled peanut butter did not cause "bodily injury" to anyone; only "property damage" is potentially implicated here. The policy defines "property damage" as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Sokol's peanut butter paste, whether rancid or merely [*11] "off taste," did not cause "physical injury to tangible property." The paste was sealed in individual packets, and those packets were simply removed from the boxes of cookie mix. There has been no allegation that the spoilage of the peanut butter affected the other food products contained within the boxes. Sokol suggests weakly that when Continental opened the boxes to remove and replace the spoiled paste, the opening itself constituted "property damage" within the meaning of the policy. The act of opening and resealing cookie mix boxes can scarcely be characterized as an "injury" to the boxes.

At oral argument Sokol also suggested that Continental's claim represents a "loss of use" of the cookie mix boxes. The policy defines "property damage" to include the loss of use of tangible property, even if the property is not physically injured. The delay in getting the cookie mix to market, Sokol argues, constitutes a "loss of use" under the policy definition and is therefore within the scope of the coverage grant. But nothing in the record bears this out. The itemized list of expenses that Continental sent to Sokol includes costs for the peanut butter packets, as well as shipping, storage, [*12] and handling, and "third-party reconditioning fees." These are not "loss of use" costs; they are costs incurred in swapping Sokol's spoiled peanut butter for fresh substitute.

Because Sokol's payment to Continental was not a sum Sokol was legally obligated to pay for "property damage" as that term is defined in policy, Atlantic had no duty to indemnify Sokol.

### C. Exclusions to Coverage

Even if Sokol's payment to Continental could be characterized as one for "property damage," two of the policy's exclusions would operate to preclude coverage. Atlantic bears the burden of establishing that Sokol's claim falls within a provision that limits or excludes coverage. *Conn. Specialty Ins. Co. v. Loop Paper Recycling, Inc.*, 356 Ill. App. 3d 67, 824 N.E.2d 1125, 1130, 291 Ill. Dec. 875 (Ill. App. Ct. 2005).

**1. Exclusion m: Damage to Impaired Property**

In its letters denying coverage, Atlantic invoked the exclusion for damage to "impaired property," one of the so-called "business risk" exclusions that are standard fare in contemporary CGL policies. Exclusion m states in full:

> This insurance does not apply to:
>
> "Property damage" to "impaired property" [*13] or property that has not been physically injured, arising out of:
>
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

The term "impaired property" is defined in the policy as:

> Tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
>
> a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> b. You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by:
>
> a. The repair, replacement, adjustment or removal of "your product" or "your work"; or
>
> b. Your fulfilling the terms of the contract or agreement.

Sokol's peanut butter paste is "your product" under the terms of the policy, and this product [*14] was incorporated into property "other than your product," that is, Continental's cookie mix. It is undisputed that the

paste became defective, deficient, or inadequate. Sokol's payment of Continental's claim thus falls within the "impaired property" exclusion under the terms of the policy.

Sokol argues that if Exclusion m applies to this claim, coverage is restored by an exception to the exclusion for "loss of use of other property arising out of sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use." We do not agree. First, as we have noted, Continental's claim was not one for "loss of use" of impaired property. In addition, the exception to Exclusion m applies only to "sudden and accidental" injuries to property. From the record it is not clear exactly when or how the peanut butter paste went bad. Sokol insists it was good when it left the plant in late August 2001; Continental discovered the problem in October 2001. These facts are consistent with the gradual deterioration of a food product. Whether or not the rancidity or bad taste was "accidental" (we express no opinion on that), the situation appears anything but sudden. [*15] Sokol cannot survive summary judgment merely by averring that the paste went bad suddenly and accidentally. And that is all Sokol does. The exception to the "impaired property" exclusion does not apply here.

### 2. Exclusion n: Recall of Products, Work or Impaired Property

Atlantic also invoked Exclusion n, which states in full:

> This insurance does not apply to:
>
> > Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
> >
> > (1) "Your product";
> >
> > (2) "Your work"; or
> >
> > (3) "Impaired property";
> >
> > if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusion n applies straightforwardly to the facts of this case. As we have noted, Sokol's peanut butter paste qualifies as "your product" under the policy. The peanut butter was withdrawn from the market, replaced, and disposed of after Continental discovered it was rancid or "off taste," an obvious "inadequacy" (if not worse). [*16] Even if the Insuring Agreement provided coverage here, Exclusion n applies to knock it out.

### D. Other Coverage Issues

#### 1. Products-Completed Operations Hazard

Sokol argues that its payment to Continental was covered under the policy's Products-Completed Operations Hazard. This provision is one of the policy's defined terms rather than a separate grant of coverage. It does not operate to provide coverage that is not otherwise extended by the policy. By virtue of references to the Products-Completed Operations Hazard definition, the policy's underlying coverage for "bodily injury" and "property damage" is extended to include occurrences that take place off the premises of the insured.

Although Sokol's peanut butter paste may have gone bad after it left Sokol's premises, the absence of "property damage" within the meaning of the policy precludes coverage here.

### 2. Product Recall Expense Endorsement

Sokol contends that its payment is covered under the Product Recall Expense Endorsement, a separate rider that operates to modify Exclusion n (Recall of Products, Work or Impaired Property). The Endorsement extends coverage to "Covered Recalls," which are defined as [*17] "recalls made necessary because the insured or a government body has determined that a known or suspected defect, deficiency, inadequacy or dangerous condition in 'your product' has resulted in or will result in 'bodily injury' or 'property damage.'"

By its terms, this endorsement is limited to recalls initiated by "the insured or a government body." Here, *Continental*--not Sokol or the government--initiated the removal and replacement of the peanut butter paste. Accordingly, the Product Recall Expense Endorsement does not supply coverage.

For the foregoing reasons, the decision of the district court is AFFIRMED.