1            IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF ALASKA

3   ERIC LUTZ, as Assignee of Rights of )
    DEAN BRUINGTON, dba DB ENTERPRISES,  )
4                                        )
                                         )
5                          Plaintiff,    )
                                         )
6        vs.                             )
                                         )
7   FIRST FINANCIAL INSURANCE COMPANY,   )
                                         )
8                          Defendant.    )
    _____)
9   Case No. A04-0229 CV (JKS)

10            DEPOSITION OF DAVID D. BUNESS

11  APPEARANCES:

12      FOR THE PLAINTIFF:        MR. TIM COOK
                                  Attorney at Law
13                                3901 Taiga Drive
                                  Anchorage, Alaska 99516
14                                (907) 336-5291

15      FOR THE DEFENDANT:        MR. ANDREW GUIDI
                                  Delaney, Wiles, Hayes, Gerety,
16                                 Ellis & Young, Inc.
                                  Attorneys at Law
17                                1007 West Third Avenue
                                  Suite 400
18                                Anchorage, Alaska 99501
                                  (907) 279-3581

19      FOR THE WITNESS:          MS. LAURA L. FARLEY
                                  Farley & Graves, P.C.
20                                Attorneys at Law
                                  3003 Minnesota Drive
21                                Suite 300
                                  Anchorage, Alaska 99503
22                                (907) 274-5100

23      ALSO PRESENT:             MR. PAUL BRACKEN

24

25

1    PURSUANT TO NOTICE, the Deposition of **DAVID D. BUNESS**

2   was taken on behalf of the Plaintiff before Lynn Hall, Notary

3   Public in and for the State of Alaska and Reporter for R & R

4   Court Reporters at the offices of R & R Court Reporters, 810 N

5   Street, Anchorage, Alaska, on the 16th day of February, 2006,

6   commencing at the hour of 1:05 o'clock p.m.

7                         * * * * * *

8                       TABLE OF CONTENTS

9   Direct Examination by Mr. Cook                              04
    Cross Examination by Mr. Guidi                              77
10

11  EXHIBITS:

12  1  - Ltr 7/24/02 to DB Enterprises from Buness              33
    2  - Certified Mail Receipt                                 77
13                        * * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

3

P R O C E E D I N G S

1
2          COURT REPORTER:  On record.  Today is February
3    16, 2005 (sic), the time is approximately 1:05 p.m.  We're at
4    the offices of R & R Court Reporters, 810 N Street, for the
5    deposition of David Buness in a United States District Court
6    case for the District of Alaska, Eric Lutz, as Assignee of
7    Rights of Dean Bruington, dba DB Enterprises, Plaintiff, versus
8    First Financial Insurance Company, Defendant.  Case number A04-
9    0119 CV (JKS).  My name is Lynn Hall.  I'm a Notary Public in
10   and for the State of Alaska and employed at R & R Court
11   Reporters.
12          Sir, would you raise your right hand, please?
13          (Oath administered)
14   MR. BUNESS:  I do.
15
### DAVID D. BUNESS
16   having been first duly sworn under Oath, testified as follows
17   on:
18
### DIRECT EXAMINATION
19          COURT REPORTER:  You may lower your hand.
20   Would you state your full name for the record, please, and
21   spell your last?
22   A      David Dale Buness.  B-u-n-e-s-s.
23          COURT REPORTER:  Thank you.  And your mailing
24   address, please?
25   A      I'm sorry.

4

1        COURT REPORTER:  Mailing address?

2    A    P.O. Box 2651, Palmer, Alaska 99645.

3        COURT REPORTER:  And a daytime telephone,

4    please?

5    A    907 269-7733.

6        COURT REPORTER:  Thank you.  Counselors,

7    please, identify yourself for the record?

8        MR. COOK:  My name is Tim Cook.  I represent

9    Eric Lutz.

10       MR. GUIDI:  Andrew Guidi and I represent First

11   Financial Insurance Company.

12       MS. FARLEY:  Laura Farley and I represent David

13   Buness.

14       MR. BRACKEN:  Paul Bracken and I work with Tim

15   Cook.

16       COURT REPORTER:  Thank you.  You may proceed.

17   **BY MR. COOK:**

18   Q    Mr. Buness, I'm just going to ask you some questions

19        here.  At first it's just some preliminary matters and

20        we'll kind of get into the meat of this.  Because this

21        is a oral examination it's being taped, you need to

22        answer the questions orally.  Nodding your head or

23        shaking your head it's hard for the court reporter to

24        pick that up.  If I ask you a question and you don't

25        understand it, let me know.  I don't want you to try to

5

1       answer a question you don't understand.  And if I start

2       to mumble and you don't hear me, let me know because

3       you want you to understand the question and answer the

4       question so that we don't go back I didn't understand.

5       Is that okay?

6  A    Okay.

7  Q    Are you hard of hearing or is there any other

8       impediment that you have that would cause you not to be

9       able to hear and answer questions today?

10  A    Not that I'm aware of.

11  Q    Have you taken any alcohol or medications that might

12       impair your memory?

13  A    No.

14  Q    Have you spoken to anyone about how to answer questions

15       during a deposition?

16  A    No.

17  Q    And I know you know this, but I'm going to say it

18       anyway.  We need to be, for lack of a better word,

19       honest in our answers.  And nobody gets in trouble for

20       honesty.  When we start trying to shade the truth

21       that's when we get in trouble.  So that's -- if we'll

22       go there I think we'll be in great shape.

23  A    Okay.

24  Q    Is it Buness, is that the way you say your last name?

25  A    Yes, correct.

6

| | | |
|---|---|---|
| 1 | Q | Okay.  I assume you finished high school, Mr. Buness? |
| 2 | A | I did. |
| 3 | Q | College? |
| 4 | A | I did. |
| 5 | Q | Where did you go to college? |
| 6 | A | I finished at Colorado State. |
| 7 | Q | And what degree did you have? |
| 8 | A | Bachelor of Science in Business Administration. |
| 9 | Q | Okay.  And when was that? |
| 10 | A | I guess that would be roughly '89, 1989. |
| 11 | Q | Any other education beyond that? |
| 12 | A | Professional type seminars and course work. |
| 13 | Q | Okay.  And when you say professional type? |
| 14 | A | Insurance industry type..... |
| 15 | Q | Okay. |
| 16 | A | .....stuff. |
| 17 | Q | And where do you work now? |
| 18 | A | Umialik Insurance Company. |
| 19 | Q | And how long have you worked for them? |
| 20 | A | Roughly a year and a half. |
| 21 | Q | And what position do you currently hold? |
| 22 | A | Claims adjuster. |
| 23 | Q | And where did you work prior to Umialik? |
| 24 | A | Northern Adjusters. |
| 25 | Q | And what position did you hold with Northern Adjusters? |

1  A    A claims adjuster.

2  Q    Okay. And was the position you held when you did the

3      inspection for the home -- Eric Lutz' home out in

4      Glennallen?

5  A    Yes.

6  Q    And how long have you been in that position when you

7      performed the inspection?

8  A    With Northern or.....

9  Q    Yeah, with Northern.

10  A    I believe I started employment with Northern Adjusters

11      January of 2000.

12  Q    Okay. And you started as a claims adjuster there?

13  A    Yes.

14  Q    Okay. And had you worked as a claims adjuster prior to

15      that?

16  A    Yes.

17  Q    And where was that?

18  A    Nationwide Insurance.

19  Q    Okay. And how long had you -- in total how long have

20      you done claims adjusting at the time that you did the

21      inspection for Eric Lutz?

22  A    I believe I started as a claims adjuster in '94.

23  Q    And at Northern Adjusters who was your immediate

24      supervisor?

25  A    Gene Dahlgren.

8

1    Q    And how were you paid by -- on salary, by the hour, by

2         the project?

3    A    By Northern Adjusters?

4    Q    Yes.

5    A    It was a combination of salary and I guess it would be

6         some sort of bonus structure depending upon work

7         product, you know, the amount of work production.  It's

8         a combination of salary and.....

9    Q    And the bonus was based on how many claims you

10        adjusted?

11   A    Not number of claims.  I believe it would be more

12        directed towards number of hours billed.

13   Q    What -- was the bonus in any way tied to the outcome of

14        the claims?

15   A    No.

16   Q    Okay.  And what was your final rate of pay at Northern

17        Adjusters on an annualized basis roughly?

18   A    I would say approximately 75,000, something like that.

19   Q    Okay.

20   A    It could vary quite a bit.  I mean.....

21   Q    Okay.  When you performed the -- most of this is going

22        to relate to the time when you performed the inspection

23        at the Lutz house.

24   A    Uh-hum.

25   Q    At that time what qualifications did you have to

1        perform the inspection and adjust the claim

2  A    I -- I guess I'm confused about your -- qualification

3        you mean....

4  Q    Yeah, what qualified you.....

5  A    .....field training or.....

6  Q    Yeah, training, credentials, et cetera?

7  A    And that inspection was that in 2002?

8  Q    Yes.

9  A    Okay.  So it'd be six years of -- approximate, I guess,

10       six years of field work.  I'm not sure how many

11       different insurance schools of various types.  And then

12       I guess additional, you know, training, different

13       courses that I took.

14  Q   Okay.  Do you how any credentials?

15  A   Professional designations?

16  Q   Yes.

17  A   Yes.

18  Q   What are they?

19  A   CCLA, I believe, and AIC.

20  Q   What does CCLA stand for?

21  A   Casualty Claims Loss Associate.....

22  Q   Okay.

23  A   .....I believe.

24  Q   And that's from AIG Insurance?

25  A   No, that is -- I think it's the insurance -- American

1      Insurance Institute, that A.....

2  Q   Okay. And pardon me, you know, I'm really dumb on

3      this, but what does it take to get this -- this CCLA

4      endorsement?

5  A   I would have to look at the -- I guess the

6      documentation that -- that they put out, but I would --

7      just off the cuff from memory I would say that that

8      designation is probably 20 separate study books and

9      tests that you -- you know, you read the book, take

10     your test, mail it off to somebody who grades it

11     and.....

12  Q   Okay. Is it self study?

13  A   It is self study.

14  Q   Okay. When we use the term adjust a claim, what

15     exactly does adjust a claim mean?

16  A   Well, that could probably vary quite a bit, I would

17     think, you know, depending on your assignment.

18  Q   Okay.

19  A   Some -- when I worked for Northern Adjusters, that's an

20     independent adjuster's position.

21  Q   Okay.

22  A   I report to my job now. So we have assignments that

23     come in from insurance carriers and they would

24     sometimes give us specific or limited assignments,

25     sometimes what some people call a full -- full

1        assignment with authority to settle claims and various

2        other aspects of it, so it -- adjusting claims, I use

3        that term.  It could vary from minimal, you know, go

4        take pictures, to something much more.

5   Q    Okay.  And really, you know, we use this term adjust a

6        claim, it's always nice to kind of narrow it down kind

7        of what we're really meaning here.  Do you have any

8        training in any type of engineering?

9   A    No.

10  Q    Any.....

11              MR. GUIDI:  I'd just object to the form of the

12  question as to the meaning of engineering or whether you mean a

13  formal study, just to be clear.  I mean it's a broad term.  I

14  don't know if you're referring to engineering courses or what

15  you're referring to, but.....

16              MR. COOK:  Let me rephrase the question.

17  Q    (By Mr. Cook)  Do you have a degree or any training,

18       any formal training in mechanical engineering?

19  A    No.

20  Q    Do you have a degree or any formal training in civil

21       engineering?

22  A    No.

23  Q    Do you have a degree or any formal training in geology?

24  A    No.

25  Q    Do you have a degree or any formal training in soil

| | | |
|---|---|---|
| 1 | | analysis? |
| 2 | A | No. |
| 3 | Q | Do you have a degree or any formal training in fire |
| 4 | | analysis? |
| 5 | A | No. |
| 6 | Q | Do you have a degree or formal training in |
| 7 | | construction? |
| 8 | A | I -- what would formal training would con- -- I mean |
| 9 | | what -- what sort of formal training are we..... |
| 10 | Q | Do you have any..... |
| 11 | A | Have I built a house? |
| 12 | Q | Yeah. |
| 13 | A | Yes, I have built a house. |
| 14 | Q | Did..... |
| 15 | A | Have I worked in the construction industry? |
| 16 | Q | Yes. |
| 17 | A | Yes. |
| 18 | Q | And what did you do in the construction industry? |
| 19 | A | Framing. |
| 20 | Q | And how long did you frame? |
| 21 | A | Two years. |
| 22 | Q | And when was that? |
| 23 | A | '86 to '88. |
| 24 | Q | Okay.  Ever acted as a general contractor? |
| 25 | A | Just on my own house. |

13

1  Q    Okay.  Do you have a degree or any formal training in
2       arctic engineering?

3  A    No.

4  Q    How many cases have you handled where the adjustment
5       was for the structural failure of a home?

6  A    I -- I don't know.  I mean over 12 years, I have -- I
7       would have no way to.....

8  Q    One, 10, 100?  I'm just trying to get an idea.

9  A    For structural failure of any kind?

10  Q    Yeah, of a home.

11  A    Of a residential.....

12  Q    Yes.

13  A    .....building?  In -- in my whole 12 year career
14       or.....

15  Q    Up until the time you did the Lutz adjustment.

16  A    Between 10 and 100.  I mean.....

17  Q    That's a pretty good range.

18  A    Well, I mean.....

19  Q    And I'm not trying to --.....

20  A    Right.

21  Q    .....to corner you.  I just -- I'm trying to get an
22       idea how much experience you have in -- in doing
23       inspections on structural failures?

24  A    I would -- if I had to just guess I would guess that i
25       see probably three to 500 buildings a year.

14

1      MR. GUIDI:  300 to 500 or three to five?

2   A   300 to 500 a year.  Those inspections have a wide array

3      of what I'm looking at, I guess.  And I try -- I don't

4      -- definitely don't have time to keep track of what's

5      water damage, structural.....

6   Q   (By Mr. Cook)  Yeah.

7   A   .....damage or -- I mean....

8   Q   And I thought I was busy.  300 to 500 a year.  How --

9      let me see if I can narrow this down a little bit.  How

10     many buildings have you inspected that had structural

11     failure that was -- god, I don't know how to frame

12     this, significant?  I mean, you know.....

13  A   That's pretty -- pretty broad term there, too.

14  Q   Pretty broad.  Let me just stop on that one.  Okay.

15     Maybe that'll clarify.  How many structural failures

16     have you inspected that were the result of a foundation

17     failure?

18  A   I guess if you want me to guess I can -- I can pose a

19     guess.

20  Q   Just.....

21  A   I mean 50.  That's.....

22         MS. FARLEY:  Is it an educated guess?

23  A   Well, it's an educated guess based on.....

24         MS. FARLEY:  Or is it just.....

25  A   That's not based on -- but, you know, my memory of.....

1 Q (By Mr. Cook)  Yeah.  Well, that's all I'm....

2 A .....six year current (ph) prior.....

3 Q .....trying to get a -- .....

4 A .....to that.  Right

5 Q .....you know, it's -- you're --  you're basically

6  maybe 10 a year over that six years?

7 A That would be my best guess, you know, without.....

8 Q How many of those were the result of permafrost or in

9  your opinion permafrost?

10 A Well, of those six -- of those six years, if we use the

11  same formula, I guess, for my educated guess of those

12  six years prior to -- or since my beginning of doing

13  claims one year of that is in the Lower 48.....

14 Q Uh-hum.

15 A .....the rest is up here.  So I guess you could

16  subtract one year from that number.....

17 Q Uh-hum.

18 A .....and it would be that figure or -- or less.  I mean

19  there are some things that -- I guess I couldn't -- I

20  couldn't tell of that number what is -- what is

21  directly related to permafrost versus, you know,

22  related to something else, site prep or.....

23 Q Okay.

24 A .....concrete or, you know, there's -- there's a

25  large.....

16

```
 1  Q      Now you investigated the loss for First Financial
 2         Insurance Company of the Lutz' home out in Glennallen,
 3         do you remember that?
 4  A      I remember portions of that.
 5  Q      Okay.  Candidly, what do you think caused the failure
 6         of that home?
 7              MR. GUIDI:  I'm going to object on form and
 8  foundation.
 9              MS. FARLEY:  You can answer.
10  A      Okay.  From my memory, and this is quite awhile ago, I
11         -- I would say it ha- -- is related to the site
12         preparation.
13  Q      (By Mr. Cook)  Okay.  And can you give me any more
14         explanation than site preparation?
15  A      Well, I -- I probably can't comment on -- I mean I --
16         I'm not an engineer.
17  Q      Right.
18  A      .....as you're aware now.
19  Q      Well, I'm just asking your.....
20  A      Right.
21  Q      .....opinion here, you know.....
22  A      Right.
23  Q      .....what do you think?
24  A      Most of the time when I look at a structure in --
25         especially in this state, if the -- as you're aware we
```

1    have some -- a lot of earth movement in the state.

2  Q  Uh-hum.

3  A  It's probably the most common cause of damage at the

4    foundation level.  It's either earth movement for frost

5    reasons or if it's maybe new construction then it's

6    possibly related to improper preparation to the -- of

7    the building site.  Without -- I mean I -- I didn't get

8    involved in any sort of excavation or anything like

9    that.....

10 Q  Okay.

11 A  .....after the inspection to determine that.  I -- I

12   would just categorize it on -- based on my memory of

13   the inspection as the structure's moving, it -- it's an

14   issue under the house.

15 Q  Yeah.

16 A  You know, whether it's.....

17 Q  And probably the result of an improper site

18   preparation, is that what I understood you to say while

19   ago?

20 A  Well, that would be the most common issue based on my

21   memory of what the age of the structure was.  You know,

22   if you, I guess, have a house and it's there for 30

23   years and there was no problem until a year where it's

24   40 below then, you know, it's probably -- it's been

25   fine for 29 years, it's probably not construction

1   related, but when it's newer you -- it tend to be --

2   fall into the other category.  But, again, that's just

3   my guess based on how -- how far my involvement went

4   into this.

5  Q   Okay.  And I just want to get an idea how claims come

6   to you, I'm not specifically asking about the Lutz

7   claim, but just kind of tell me -- explain to me how a

8   claim comes to you when -- you know, how does it land

9   on your desk?  Where does it come from?  Just kind of

10   walk me through the process.

11  A   While I was at Northern Adjusters?

12  Q   Yes, at Northern Adjusters.

13  A   Okay.  Typically it was assigned to me specifically by

14   my supervisor.

15  Q   Okay.

16  A   My understanding is that it either can come via fax,

17   phone call, e-mail into our office in general, and then

18   it's distributed to the appropriate adjuster.

19  Q   Okay.  And what do you -- I assume it's a piece of

20   paper that says do an inspection or an adjustment on

21   this claim?

22  A   If it's a fax, yeah.

23  Q   Okay.  And kind of walk me through typically what you

24   do in a situation like this?

25  A   Well, it depends on the client, you know all the

1    customers will have a different -- may -- may have

2    different criteria as far as what they want done.  I

3    guess just generically speaking a normal claim you

4    would initiate contact with somebody, either a building

5    owner or an insured, and schedule some inspection if it

6    is specific to a building damage.  Go and inspect it,

7    and then depending on what was the request gather

8    information and send that somewhere.

9  Q    Okay.  When you say somewhere I assume is that back to

10      the insurance?

11  A    To the customer.

12  Q    Okay.  And the cus- -- just so I'm clear the customer

13      is the insurance company?

14  A    Primarily,.....

15  Q    Primarily

16  A    .....yeah.

17  Q    Okay.  Do you typically-- you get this assignment if

18      it's faxed to you, do you call the insurance company

19      before -- and talk to their claims person before you do

20      -- you go on the assignment or do you just.....

21          MS. FARLEY:  Are you asking generally?

22          MR. COOK:  At Northern Adjusters in particular.

23  A    And -- and generally?  Because I mean each.....

24  Q    (By Mr. Cook)  Yeah,.....

25  A    Some -- some.....

1  Q      .....and generally at Northern Adjusters.

2  A      Right.

3  Q      Not -- Umialik I'm not worried about.

4  A      Right.  But I mean certain -- even like Northern

5         Adjusters certain clients.....

6  Q      Oh, vary -- I'm sorry, I didn't mean that -- does it

7         vary from customer to customer?

8  A      It can, yes.

9  Q      Okay.

10 A      Yeah.

11 Q      And so the client is typically the insurance company?

12 A      Correct.

13 Q      Okay.  Do you typically draft a reservation rights

14        letter when you do an adjustment?

15 A      That would be dependent upon the type of claim and/or

16        if they the customer requested it.

17 Q      Okay.

18 A      It depends.

19 Q      Okay.  It's not unusual for you to do the reservation

20        of rights letter?

21 A      Not unusual, but a large number of claims it's not used

22        or likely necessary.

23 Q      Okay.  When you do a reservation of rights letter, do

24        you receive instructions from the insurance company on

25        how to write the ins- -- reservation of rights letter

21

1       or.....

2  A    You can.

3  Q    And what kind of instructions do they give you?

4  A    That would vary quite a bit also, I mean, by client and

5       possibly by adjuster, who you're reporting to, but it

6       may reference sections of the policy or concerns

7       or.....

8  Q    Okay.  When you do the reservation of rights letter do

9       you rely on any facts or investigation or it is pre-

10      investigation?

11  A    I'm sorry, could you repeat that?

12  Q    When you -- when you send -- when you draft a

13      reservation of rights letter.....

14  A    Uh-hum.

15  Q    .....in a normal case do you do that before you do any

16      investigation and gather any facts or is it after?

17           MR. GUIDI:  Object to form of the question.

18  You can go ahead.

19  A    I would say use the information that you have available

20      there, but prior to -- it depends on the type of claim,

21      but certainly you would want to forward that to the

22      insured prior to, you know, a typical claim is

23      inspecting the insured's building or something like

24      that.

25  Q    (By Mr. Cook)  And what's the purpose of the

22

1    reservation of rights letter?

2  A    To give them -- or to advise them of possible policy

3        limitations or exclusions that could apply based on

4        current information.

5  Q    And whose rights does the reservation of rights letter

6        reserve?

7  A    The in- -- both the insurance company and the policy

8        holder.

9  Q    How does it reserve any rights for the policy holder?

10 A    Well, it gives the -- it gives the -- it identifies the

11       possible areas of the policy that could exclude

12       possible payment or -- or coverage.  It identifies that

13       to them.

14 Q    Okay.

15 A    It could, I guess, act differently.

16 Q    So when you do the actual investigation on a building

17       that has a structural failure, how do you go about

18       doing that?

19 A    In general terms?

20 Q    Yes, in general terms.

21 A    Okay.  And I guess I would separate -- I would separate

22       site inspection from -- personally the term

23       investigation leads me to other areas.....

24 Q    Okay.

25 A    .....so I -- I wouldn't use -- I'm just saying.....

1   Q       Yeah, educate me.  I mean I.....

2   A       I mean the site inspection typically you have somebody

3           that's familiar with the building there.

4   Q       Uh-hum.

5   A       You -- I typically do an exterior walk around.

6   Q       Uh-hum.

7   A       And do an interior walk around with that party

8           gathering any information they may have.  And then

9           after I've done that specifically go to certain areas

10          of the building and do more detailed inspection, I

11          guess.  It may include measurements, photographs,

12          typically not any sort of demo or anything like that,

13          you know.  There's no dismantling of anything

14          typically.

15  Q       Do you ever employ experts to examine a site?

16  A       On my claims?

17  Q       Yes.

18  A       I have, yes.

19  Q       What kind of experts?

20  A       Could be engineers of various expertise, could be

21          soils, could be, you know.

22  Q       Okay.  Typically do you need to get special permission

23          from the insurance -- the insure- -- the client to

24          employ experts or is that on your own?

25  A       That varies by customer, but for the most part, yes.

1  Q    For the most part yes, you need special permission?

2  A    Correct.

3  Q    Okay.  Do you typically make reports to an insurance

4      company during the course of the investigation or is it

5      just at the close -- or is it just a close and report?

6  A    Typically there's more than just a closing one.  It

7      depends on the duration of the claim, how long it goes

8      out, and what authority you may have in the claim, and

9      those sorts of things of issues.

10  Q    Okay.  In your report do you make recommendations or is

11      it strictly a recitation of the facts?

12  A    That depends on the client also.  Some clients you have

13      a working relationship where you have standard

14      authority to settle their claims in whatever manner you

15      see fit.  And other clients it's no authority and you

16      just report the facts as you identify them.

17  Q    With -- did you have -- you use the term working

18      relationship?

19  A    Uh-hum.  (Affirmative)

20  Q    Did you have a pretty close working relationship with

21      First Financial?

22  A    I don't believe that I had done very many claims for

23      them.  That's -- I don't know how many, but.....

24  Q    Yeah, you anticipated what I was saying.  When you --

25      many, is that five or is it 50 'cause I kind of

1    surprised me there.....

2  A    My -- myself for that company it would not be 50.  It

3    would be probably closer to the five.

4  Q    Okay.

5  A    Me personally.  I have no idea how many Northern

6    Adjusters did.  I did -- I did not complete all their

7    claims.

8  Q    And with First Financial did you typically make

9    recommendations or was it just a recitation of the

10    facts?

11  A    Typically no recommendations.

12  Q    And with First Financial did you -- would you determine

13    whether a claim should be paid or just a recitation of

14    facts?

15  A    Yeah, the authority was -- I did not have authority for

16    nor recommend payment.

17  Q    Okay.  And specifically with this claim, the Eric Lutz

18    claim out in Glennallen and, you know, we've got three

19    players here.  We've got Dean Bruington who was the

20    contractor and the insured and then Eric Lutz who was

21    the homeowner.

22  A    Okay.

23  Q    And First Financial, I guess, is a third party.

24  A    Uh-hum.

25  Q    So with a cl- -- with regard to the claim made by Dean

26

1      Bruington, could you explain how that case came to you, do you recall?

2

3  A    I believe it's via fax.....

4  Q    Okay.

5  A    .....through Gene's office.

6  Q    Gene?

7  A    Dahlgren, my supervisor.

8  Q    Oh, okay.  And let me show you this is Bates number

9      FFIC 0148 titled New Loss Assignment, would that be the

10     document that initiated your introduction to this

11     claim?

12  A   I would believe so, yes.

13  Q   Okay.

14  A   July -- yeah, that's probably it.

15  Q   And this would have come from Robert -- I'm going to

16     give you back this FFO (ph).....

17  A   Okay.

18  Q   .....0148, that would have came -- come from Robert

19     LaFrance at First Financial Insurance?

20  A   I believe so as it's -- that's how it's titled.

21  Q   Okay.  Would you have called him or just gone straight

22     to work?

23  A   I may have called him or attempted to call him.

24  Q   And....

25  A   And -- and see if there's any additional information.

1   Q       Okay.  What kind of information would you be looking

2           for?

3   A       Well possibly an ACORD form which is kind of a standard

4           agent's form for reporting a loss to an insurance

5           company.

6   Q       Anything else that you'd talk about?

7   A       Well, I -- I don't know that I did --.....

8   Q       Okay.  I'm --.....

9   A       .....did call him.

10  Q       .....yeah, I understand it's been.....

11  A       Right.

12  Q       .....a couple of years, but I'm just trying to get a

13          feel for, you know, how -- what kind of conversation

14          you'd normally -- pardon me, normally have with someone

15          like Robert LaFrance.

16  A       Is this -- is this the entire assignment form?

17  Q       There may have been an ACORD.....

18  A       Well, if I -- to answer your question I guess if I just

19          got this I probably would have called him because

20          there's not even any contact information on it.

21  Q       This is -- and I don't know that's what I'm trying to

22          find out is what came to you.

23  A       Okay.

24  Q       I think this is the original ACORD.  I think that's all

25          I've got.

1   A       Yeah.  That's.....

2                   MR. GUIDI:  The ACORD is a two page form.  You

3   should have.....

4   A       Right.  This is.....

5                   MR. GUIDI:  ....two sides to it.

6   A       This is not an ACORD form.

7   Q       (By Mr. Cook)  Okay.  Here it is.

8                   MR. GUIDI:  Well, I guess before you show the

9   record I'm just going to object on form and foundation.  And I

10  know you're trying to establish what he looked at, but what he

11  obtained, but I just wanted to make that objection.  Here go,

12  Laura, you can read mine.

13                  MS. FARLEY:  Okay.

14                  MR. GUIDI:  What do you need?

15  A       (Indiscernible) right.  I mean I don't know whose.....

16                  MS. FARLEY:  I don't know if that was Northern

17  Adjusters.

18  A       I don't believe that is.  I don't know.

19  Q       You don't know whether that -- you received that

20          document or not?

21  A       I don't just based -- I mean just looking at it now?

22  Q       Yeah.

23  A       This -- this is an ACORD form.  I don't recognize this

24          fax number as being Northern Adjusters, but it could --

25          I don't know whether.....

1  Q    And I apologize, it may -- this is the cover page.  It
2       may be that this is the document that was sent from
3       Denali to AES and I'm trying to determine what you
4       received.

5  A    Okay.

6              MR. GUIDI:  To AES?

7              MR. COOK:  A -- yeah, AES.  I'm sorry, not AEC.

8              MS. FARLEY:  So is the question what does he
9  remember he received?

10             MR. COOK:  Right.

11 Q    (By Mr. Cook)  Do you know if you received any of these
12      documents?

13 A    I believe I received this one probably.

14 Q    That's FFIC 0148. Down here that's the Bates number in
15      the corner.

16 A    Okay.  I would assume I received something additional
17      to this, but I -- I mean I can't from my memory tell if
18      these two documents are what I got for sure.

19 Q    Okay.

20 A    The reason I assume that is 'cause this doesn't give me
21      enough information to schedule and conduct a site
22      inspection.

23 Q    Okay.  Now just for the record the location of the
24      home, do you recall what the location was at
25      Glennallen?

| | | |
|---|---|---|
| 1 | A | I remember generally where -- where it is, yeah. |
| 2 | Q | Okay.  This was the home for Eric Lutz on Memory Lane |
| 3 | | in Glennallen.  Just so -- just so that we all are on |
| 4 | | the same page..... |
| 5 | A | Uh-hum. |
| 6 | Q | .....we're not talking about some other home. |
| 7 | A | Okay. |
| 8 | Q | So we're all in agreement on that? |
| 9 | A | Okay. |
| 10 | Q | Okay. |
| 11 | A | Yes. |
| 12 | Q | What was the scope of work that you were given by First |
| 13 | | Financial with regard to that claim? |
| 14 | A | Well, going off of this it was sent a reservation of |
| 15 | | rights letter.  And it says full investigation and |
| 16 | | adjustment of the loss report back to them basically, |
| 17 | | that's what it says. |
| 18 | Q | Okay.  So what does that mean when you -- when they say |
| 19 | | full investigation of the loss and report back to them? |
| 20 | | What..... |
| 21 | A | Well, that -- that term actually varies quite a bit by |
| 22 | | client and it's probably one of those terms that's mis- |
| 23 | | -- misused..... |
| 24 | Q | Uh-hum. |
| 25 | A | .....as far as technical terms, but the other thing |

1    with assignments is they -- they are not stationary or

2    solid.  I mean they -- they change, get some

3    information in and now it's not a full assignment, it's

4    a limited or, you know, whatever.  It can change

5    dramatically from the initial, but basically it's, you

6    know, send a reservation of rights and investigate it

7    so you'd have to do a site inspection which would

8    typically include, you know, measurements, photographs,

9    stuff like that.  Gather whatever information that you

10    can and send it back to the assigning claim manager it

11    looks like.

12  Q    And First Financial was the client in this case?

13  A    Yes.

14  Q    And you were acting on their behalf?

15  A    Yes.

16  Q    So in effect, you were acting as a representative or

17    agent of First Financial Insurance?

18        MR. GUIDI:  Object to the form of the question

19  and foundation.

20        MS. FARLEY:  You can answer.

21  A    I was working -- or Northern Adjusters was working for

22    them, First Financial.

23  Q    (By Mr. Cook)  You were acting as their representative?

24  A    I guess to the point of the site inspection and -- and

25    the local field work, yeah.

32

1 Q    You were instructed to write a reservation of rights

2      letter on behalf of First Financial?

3 A    Yes.

4 Q    And did you write a reservation of rights letter?

5 A    I believe so.

6 Q    So as far as the reservation of rights letter you were

7      acting as their representative, were you not?

8 A    Uh-hum.   (Affirmative)

9 Q    Who instructed you to write the letter of reservation

10      of rights?

11 A    I would say Robert LaFrance.

12           MR. COOK:  Can we -- can you find that

13 reservation of rights letter?

14           MR. BRACKEN:  Yeah.  Yeah.

15 Q    (By Mr. Cook)   This is Bates number FFIC 0139 and 140

16      titled Northern Adjusters Certified Mail Return Receipt

17      Requested, Reservation of Rights.  Is this a copy of

18      the letter that you sent to Mr. Bruington?

19 A    I would say it appears to be, yes.

20 Q    And does it appear to be a true and correct copy of

21      that letter?

22 A    It looks like the correct format to me.  I mean I don't

23      remember verbatim what was typed, but I -- this appears

24      to e a Northern Adjusters' letter that was drafted by

25      myself.

1    Q        Okay.

2             MR. COOK:  Just for the record can we get this

3    marked as an exhibit?

4             COURT REPORTER:  1 is marked.

5             UNIDENTIFIED VOICE:  We should probably do the

6    copy.

7             MR. COOK:  This is the same letter.  It just

8    doesn't have the highlighting on it.  That's.....

9    A        Okay.

10            MR. COOK:  Let's do this one.  That's.....

11            COURT REPORTER:  Okay.

12                            (Deposition Exhibit 1 marked)

13            MS. FARLEY:  And it's two pages, right?

14            MR. COOK:  It's two pages.

15   Q        (By Mr. Cook)  And this reservation of rights letter

16            was addressed to the insured, Dean Bruington?

17   A        It that a question?

18   Q        Yes.  It was addressed to Dean Bruington?

19   A        It's addressed to DB Enterprises care of Mr. Dean

20            Bruington.

21   Q        Okay.  Now prior to sending this reservation of rights

22            letter did you do any investigation?

23   A        Could you I guess re- --.....

24   Q        Sure.

25   A        .....give me some more detail with that.....

34

1  Q    Yeah.  What -- when you got the assignment.....

2  A    Uh-hum.

3  Q    .....the instructed you to write a reservations of

4       rights letter.....

5  A    Uh-hum.

6  Q    .....prior to writing the reservation of rights letter

7       did you call Dean Bruington, did you call -- did you do

8       any investigation, did you gather any facts?

9  A    I probably did not call Mr. Bruington.

10 Q    Okay.

11 A    I am not sure if I would have called Mr. Lutz.

12 Q    Okay.

13 A    It should be in our file if -- in my log notes.

14 Q    I'm going to -- I assume this is the log notes you're

15      referring to, is that what you're calling log notes?

16 A    Yes.

17 Q    Okay.  Now under the date 7/18, 2002, 7/18, 2002, it

18      says due to special instructions on assignment I will

19      not be contacting the insured until I have confirmed --

20      I'm sorry, I can't read upside down.  Due to special

21      instructions on assignment I will not be contacting the

22      insured until I had confirmation that he received the

23      reservation of rights letter.  So you would not have --

24      I assume you didn't contact him, is that true?

25 A    That appears to be the case, yes.  It looks like I

1   contacted the claimant on the same date, 7/18.

2  Q   Okay.  7/18 it says Eric was not at home, so may -- you

3       tried to contact him.....

4  A   Uh-hum.  (Affirmative)

5  Q   .....and I assume he wasn't there?

6  A   That appears to be correct.

7  Q   Okay.  Now.....

8           MR. GUIDI:  The witness is referring to a

9  document, perhaps you could identify.....

10          MR. COOK:  I'm sorry.  My apologies.  We're

11 looking at what's Bate stamped FFIC 0083.  Can we go off record

12 for just a second?

13      (Off record)

14      (On record)

15 Q   (By Mr. Cook)  Yeah.  I guess I'm -- when it says due

16      to special instructions on the assignment I will not be

17      contacting the insured.  Why -- is that -- why would

18      they give you that instruction?

19          MR. GUIDI:  Well, I think that's a

20 misstatement.  I object to the form and foundation.

21 Q   Let me rephrase the question.  Now we're still on FFIC

22      0083, on the date 7/18 2002 it says due to special

23      instructions on assignment I will not be contacting the

24      insured.  Why would they give you special instructions

25      not to contact the insured?

1  A     Be- -- I guess I'm reading this log note a little

2        differently.

3  Q     Okay.

4  A     I mean.....

5  Q     Okay.  I'm just trying to figure out.....

6  A     Right.

7  Q     Yeah.

8  A     The -- the way I read this particular log note that

9        you're referencing is not that they gave instructions

10       not to contact the insured.  I don't read it that way.

11 Q     Okay.

12 A     It's due to special instructions on assignment, comma,

13       I will not be contacting the insured until I have

14       confirmed -- confirmation that he received the

15       reservation of rights.

16 Q     Okay.  What was the special instruction?

17 A     Well, special instructions is -- if this form is what

18       we got which I'm assuming is what this is the

19       assignment sheet.....

20 Q     Okay.  That's 0148.....

21 A     That's.....

22 Q     .....yeah.

23 A     Right.  That's the special instructions as it's titled

24       right here, Special Instructions.

25 Q     Okay.  And so that was -- this is what you were

1    referring to in your log notes?

2  A    Yeah.

3  Q    Okay.

4  A    That I received special instructions, not that there's

5    special instructions included not contacting the

6    insured.

7  Q    Okay.  That -- thank you for clearing that up.

8  A    Okay.

9  Q    It was a bit muddy for me.  Now as far as Dean

10    Bruington is concerned were you the point of contact

11    for FFIC?

12              MS. FARLEY:  Object to the form.

13  A    I guess I'm confused as to your question.

14  Q    (By Mr. Cook)  Well, can you give me the new loss

15    assignment again.  At the bottom of the new loss

16    assignment it says -- the very last sentence says

17    please do not refer insured or claimants to me.  Our

18    telephone number is for your use only, is that typical?

19  A    I guess if -- if I'm categorizing claim assignments in

20    general.....

21  Q    Uh-hum.

22  A    .....that I -- that I received, probably I wouldn't say

23    typical.

24  Q    Okay.  If -- for First Financial is that typical?

25  A    I'm not sure if that particular sentence is on their

38

| 1 | | loss assignments or not. |
|---|---|---|
| 2 | Q | Okay. |
| 3 | A | And I mean it's obviously on this one, but I couldn't |
| 4 | | tell if it was on every one or not. |
| 5 | Q | Do you have -- do you know why they would instruct you |
| 6 | | not to give out their telephone number? |
| 7 | A | I don't know.  I mean I could guess, but..... |
| 8 | Q | I mean I'd love a guess. |
| 9 | A | Well, I..... |
| 10 | | MS. FARLEY:  We wouldn't like a guess. |
| 11 | A | Okay. |
| 12 | | MS. FARLEY:  If you don't know you can't..... |
| 13 | A | Yeah, I don't know.  I mean..... |
| 14 | Q | (By Mr. Cook)  Now after the reservation of rights |
| 15 | | letter was sent out, I assume that's when you brought |
| 16 | | -- began the investigation? |
| 17 | A | I would say looking at the log note I called -- or |
| 18 | | attempted to call Eric on July 18, 2002, Eric Lutz. |
| 19 | Q | Okay. |
| 20 | A | I would consider that part of the investigation. |
| 21 | Q | Okay.  As part of the investigation did you determine |
| 22 | | the extent of damage to the home? |
| 23 | A | I reported back information to the insurance company |
| 24 | | from my -- from my memory.  I -- I reported back with |
| 25 | | descriptions, photographs, stuff like that.  From |

| | | |
|---|---|---|
| 1 | | memory I do not remember if -- if I completed a repair |
| 2 | | estimate. |
| 3 | Q | Okay. |
| 4 | A | Looking at -- it's not on this page. |
| 5 | Q | Uh-hum. |
| 6 | | MR. COOK:  Off record for just a moment. |
| 7 | | (Off record) |
| 8 | | (On record) |
| 9 | Q | (By Mr. Cook)  Okay.  This is the copy that we received |
| 10 | | of the report you provided -- what's the word I'm |
| 11 | | looking for, that you wrote and provided to Nor- -- to |
| 12 | | First Financial on July the 30th, 2002.  And this is |
| 13 | | Bates numbered FFIC 0086 through FFIC 00170.  Hopefully |
| 14 | | that can refresh your memory a little bit.  In your |
| 15 | | opinion how badly damaged was the home? |
| 16 | A | From my memory I would say it had just generally |
| 17 | | moderate to severe damage. |
| 18 | Q | Moderate to severe damage.  What kind of damage did it |
| 19 | | have? |
| 20 | A | Are my pictures in here? |
| 21 | Q | I believe so. |
| 22 | A | From memory I believe I remember doors -- some doors |
| 23 | | that wouldn't close properly, possibly some windows |
| 24 | | that didn't close properly.  Apparent cracks in drywall |
| 25 | | in various locations.  And some apparent water in the |

40

1          crawl space looking at the pictures.

2    Q     Do you remember whether the garage door was displaced?

3    A     I don't remember that either way.  By displaced you

4          mean cracked?

5    Q     I mean it had dropped approximately 18 inches.

6    A     I don't -- I don't remember whether or not that was the

7          case without, I guess, further reviewing this report.

8          Looking at the report from July 30 there is a note in

9          here regarding a portion sinking approximately 11

10         inches.

11   Q     Okay.  Eleven inches?

12   A     Yeah.

13   Q     So I guess I'm asking moderate to severe damage is a

14         pretty broad spectrum.  Would you say this is -- the

15         house had suffered severe damage?

16   A     I would say that's a relative term.

17   Q     In your opinion?

18   A     Well, on oc- -- I mean I have seen structures that are

19         laying flat, you know, so that would -- I would

20         categorize that as severe.  A house with a small crack

21         in the drywall would be minor.  I guess this is in

22         between.

23   Q     Would you consider the house a total loss at that

24         point?

25   A     This house?

41

1    Q      Yes.

2    A      Based on what I'm looking at right here?  I

3           couldn't.....

4    Q      Based on your inspection of.....

5    A      Well, I couldn't -- I couldn't say that either way

6           because I don't see -- I guess if I had the remaining

7           portion of this I could tell you if I actually wrote an

8           estimate.  I don't.....

9    Q      What is that, the.....

10   A      That's the log notes.

11   Q      ....Bates numbers.....

12   A      Oh, 0083.

13   Q      0084.  Just a second.  This is the two pages

14          additional, 84 and 85.

15   A      I would say based on this -- these log notes I did not

16          complete a repair estimate for this structure.

17   Q      Okay.  From your inspection and expertise at the time

18          you inspected the home was it a total loss?

19                  MR. GUIDI:  Object on form and foundation.

20   A      I wouldn't be able to tell without -- I mean that would

21          be the next in general terms inspecting a building

22          that's damaged.  There's -- there's more work to be

23          completed that's not here to address whether it's

24          repairable or not.

25   Q      (By Mr. Cook)  So you didn't determine whether it was

1      repairable or not?

2  A    I did not complete a repair estimate.....

3  Q    And why is that?

4  A    .....based on this.

5  Q    Why would that be?

6  A    Well, I would have to review the -- the notes here, but

7      I believe the -- I believe after I reported back to the

8      company I believe it was -- I was advised to close the

9      file, I think.  (Indiscernible) July.  Looking at this

10     log note it appears that August 8th of '02 I was given

11     instructions from First Financial outlining further

12     information to gather and then told to conclude file.

13     Close my --  my field file which apparently did not

14     include further evaluation of the damage or a repair

15     estimate or a ACV report or anything like that.

16  Q   Do you remember why Mr. LaFrance he told you he wanted

17     to conclude the file?

18  A   No.  My log note says he will resume slash conclude

19     file.

20  Q   What does that mean?

21  A   That I'm done basically.

22  Q   What does it mean he will resume conclude file?  I

23     guess I'm not clear on that.

24  A   Well, basically that I'm not doing anything else --

25     Northern Adjusters is not doing any further work for

43

```
 1            their company in this regard -- in this matter.
 2   Q     So, in essence, they have enough information to make a
 3         decision?
 4   A     I.....
 5                  MR. GUIDI:  Object to the form of the question.
 6   A     I wouldn't necessarily agree with that, but it's just
 7         my instructions to be that I'm not.....
 8   Q     (By Mr. Cook)  Okay.  So on 8/08  -- let me go -- on
 9         8/08 it says discussed available information and
10         necessary items.  What were the necessary items?
11   A     That I don't remember.  Secure -- it would likely refer
12         to items listed in my report.
13   Q     And what items are those?
14   A     Well, based on this report it appears photographs, re-
15         -- a copy of the reservation of rights, soil test logs
16         and blueprints were enclosed with this report.  The
17         plan of action outlines additional things based on
18         current information that I planned on doing which was
19         secure contact with named insured, obtain necessary
20         investigative information to include documents related
21         to the construction of the dwelling.  To obtain and
22         record a statement from listed claimant.  Identify and
23         contact relevant inspection service to obtain
24         inspection documentation through the course of the
25         construction.  That's the three things listed on my
```

1    report.

2  Q    Okay.  Were you aware that the Lutz family was living

3       in the home when you did an inspection?

4  A    I remember meeting I believe it was Eric Lutz when I

5       did the inspection.  He was -- I believe it was him

6       that was present.....

7  Q    Okay.  Do you remember....

8  A    .....from memory.

9  Q    .....if they were living in the home?  Was the home

10      occupied?

11 A    I believe it was.

12 Q    And you are aware that a number of doors were not

13      operative?

14 A    I do not know how many, but I do remember noting some

15      egress impingements, I guess.

16 Q    Okay.  Did you also notice that the water -- let me try

17      that again.  Did you notice that the water heater was

18      displaced several inches from the exhaust flue?

19 A    From memory I don't remember that, but I would have to

20      review my report here and see if it references it.

21      (Pause)  Okay.  I just -- in reviewing this July 30

22      report I don't -- I don't see any reference to the hot

23      water heater, but.....

24 Q    If it had been displaced would you have noticed that?

25            MR. GUIDI:  I'm going to object to the form of

1   the question.

2   A       Yeah, I don't know.  I mean if it -- if it's brought to

3           my attention.....

4   Q       (By Mr. Cook)  Okay.

5   A       .....I mean.....

6   Q       And I don't mean to be snide, but this -- you know, in

7           terms of a competent investigation.....

8   A       Uh-hum.

9   Q       .....would a competent investigation reveal that the

10          hot water heater was displaced several inches from the

11          exhaust flue?

12                  MR. GUIDI:  Object to the form of the question,

13  foundation.

14  A       I guess it would depend on the -- on the structure and

15          -- and who I'm walking through with.

16  Q       So your answer is no, a competent investigation would

17          not have revealed that?

18  A       Well, it may or may not.  I mean it -- something

19          displaced from a vent may not be quite as visible as a

20          door that's not lining up or a great big crack in the

21          wall.  You know, during my walk throughs whoever is

22          with me is likely talking.

23  Q       Uh-hum.

24  A       Pointing out certain things.  It's always possible that

25          actually my attention is drawn away from something

1  because they're pointing something else out over here.

2  And I cannot remember how this particular walk through

3  went, but.....

4 Q Would you say that a exhaust flue displaced several

5  inches from a hot water heater would be a considerable

6  safety hazard?

7 A It could -- could be, yes.

8 Q In your opinion was the home safe?

9 A When I inspected it?

10 Q Yes.

11 A Well, from memory I -- I would have some concerns with

12  door operation.

13 Q Okay.

14 A That's.....

15 Q Were you at all concerned about the safety of the

16  people that were occupying the home?

17    MR. GUIDI:  Object to the form of the question.

18 A I don't -- in reviewing this report I don't see where I

19  -- you know, made -- made mention of an obvious safety

20  hazard in this report back to the insurance company.

21  What may have -- or may not have been discussed at the

22  site with the homeowner I can't -- I can't remember.

23 Q (By Mr. Cook)  Do you -- and I think you just answered

24  this, but I need to ask the question anyway.  Did you

25  recommend that the occupants seek alternate

1      accommodations because of the safety concerns?

2  A    Not to my memory.

3  Q    Would you have broached that subject of alternate

4      accommodations with First Financial?

5          MR. GUIDI:  I guess I'll object to the form of

6  the question.

7  A    I -- it would depend on the assignment, I believe, I

8      mean to what degree were.....

9          MR. GUIDI:  Is the question did he broach the

10  subject or to speculate as to whether he did?

11          MR. COOK:  Let me rephrase it.

12  Q    (By Mr. Cook)  Did you broach the subject with First

13      Financial about providing alternate accommodation to

14      the occupants?

15  A    Not to my memory.

16  Q    As part of the investigation how many people did you

17      interview or otherwise communicate with?

18  A    In -- while I handled -- while I was involved in this

19      claim?

20  Q    Yes.

21  A    Based on review of this -- these log notes I would say

22      that I spoke with a Cynthia at the claimant's

23      residence.  It appears I spoke with Eric Lutz.  It

24      appears I spoke with the wife of the insured.  It looks

25      like I spoke with an unidentified adult male.  I spoke

1    with Robert LaFrance.  And that appears to conclude
2    verbal communication.  Do you want me to go back
3    through with written?
4  Q  Yes, please.
5  A  It looks like a statutory letter to insured and
6    claimant.
7  Q  That would be Bruington?
8  A  That would be Dean Bruington and Eric Lutz.  Do you
9    want me to duplicate these or not?
10 Q  I don't -- no, I'm just trying to find out who you
11   communicated with.
12 A  Okay.  So I don't need to reiterate.....
13 Q  The same people.....
14 A  Okay.
15 Q  .....no.
16 A  Okay.  Well, the only other written correspondence is
17   referenced in this log note from DB Enterprises, but I
18   don't know if it was from the insured, a secretary or
19   something.....
20 Q  Okay.
21 A  .....whoever that is.  And that appears to be it based
22   on these log notes.
23 Q  So on the verbal communications you listed Cynthia,
24   Eric Lutz, Dean Bruington's wife and an unidentified
25   male and LaFrance.  Now were the -- let me just -- I

1   guess is that all of the verbal communications that you

2   recall?

3 A  Yeah, I believe that's what I just said.

4 Q  I'm ont trying to trick you.  I'm just.....

5 A  Right.  No, I'm -- yeah, something happening in 2002,

6   if it's not in this log note I probably cannot

7   remember.....

8 Q  Then it didn't happen?

9 A  Well, I probably don't remember it, but.....

10 Q  Okay.  The -- and I'm just going to go quickly through

11   these, but I just want to be sure I'm understanding.

12   The verbal communications with -- let's just start with

13   Cynthia, was that in person or the tel- -- or via

14   telephone?

15 A  That would be via telephone.

16 Q  And with Eric, would that be in person or via telephone

17   or both?

18 A  Throughout the life of the claim?

19 Q  Yes.

20 A  My --- well, in person on July 23rd.

21     MR. GUIDI:  If there's a good time in the next

22 couple of minutes can we take a break.  We've been going more

23 than an hour.  I appreciate it.

24     MR. COOK:  Oh, you bet.  Yeah, about five

25 minutes and I'll be in a good spot.

1   A      Your question again was.....

2   Q      The.....

3   A      .....Eric.....

4   Q      .....the times when you spoke to Eric, what were the

5          dates and was it in person or on the telephone?

6   A      Eric specifically?

7   Q      Yes.

8   A      It looks like 7/19, 2002.

9   Q      And was that in person or on the phone, or can you

10         tell?

11  A      I would assume on the phone.

12  Q      Okay.

13  A      In person 7/23/02.

14  Q      Okay.  And is that all for Eric?

15  A      Based on this log document.

16  Q      Okay.  For Mr. Bruington's wife was that in person or

17         on the telephone, can you tell?

18  A      That would have been on the telephone.

19  Q      Okay.  And do you know what the gist of that

20         conversation was?

21  A      I can tell you what my log says as soon as I find it.

22         On 7/30 it says wife indicated that he was not

23         available at this time.  Requests that he contact me

24         immediately or as soon as possible as I will need some

25         documentation and statement from him regarding this

1      claim.

2  Q   So -- and I don't mean to put words in your mouth.....

3  A   Uh-hum.

4  Q   .....but basically nothing substantive from her?

5  A   It appears as though I'm trying to get additional

6      information and -- and contact the named insured.

7  Q   Okay.  But I guess what I'm saying is she didn't give

8      you any substantive information about the claim?

9  A   There's none listed in this log.

10 Q   Okay.  And that was the only time you talked to her was

11     on 7/30?

12 A   It looks like that's the only discussion with her.

13 Q   Okay.  And I don't mean to be picking hairs here

14     or.....

15 A   Uh-hum.

16 Q   .....nits or whatever that term is.  When you say the

17     only discussion I assume that means the only time you

18     talked to her?  You weren't trying to parse words with

19     me?

20 A   No, I said it that way because on a different date I

21     left a message.

22 Q   Oh, okay.  All right.

23 A   I attempt to contact but.....

24 Q   Okay.

25 A   .....didn't speak back and forth to her.

1    Q    On the -- as far as the unidentified male goes at the

2         Lutz home.....

3              MR. GUIDI:  No, at the Bruington home.

4    Q    (By Mr. Cook) I'm sorry.  At the Bruington home, my

5         apologies.

6              MR. GUIDI:  You need a break.

7              MR. COOK:  I'm trying to get there, but I felt

8    we ought to finish this little piece up.

9    Q    Are you -- did you -- as far as the unidentified male

10        at the Bruington home was there any substantive

11        information gathered in that conversation?

12   A    I would say no looking at this log entry.

13   Q    Okay.  And I think this is a good time to take a break.

14        Are you ready to take a break?

15   A    Sure.

16   Q    Yeah.

17        (Off record)

18        (On record)

19        (Off record comments)

20   Q    (By Mr. Cook)  Just -- I just want to be sure with

21        regard to the people you talked to, if you had talked

22        to anyone else it would be in your log notes, is that

23        correct?

24   A    I believe so.  Typically it should be.

25   Q    Did you contact any of the subcontractors that worked

53

1        on this project?

2    A   It doesn't appear as though I spoke with the

3        subcontractors.

4    Q   Okay.  In your experience on construction projects, are

5        also con- -- let me try again.  Are all the

6        subcontractors used on a construction project

7        independent contractors?

8            MR. GUIDI:  Object to the form of the question

9    and foundation.

10           MS. FARLEY:  You can answer if you know.

11   A   I don't know.

12   Q   (By Mr. Cook)  Did you speak to the subcontractor

13       Shelton, Mike Shelton?

14   A   I don't see a log note in here indicating I spoke with

15       him.

16   Q   Did -- let me be clear 'cause sometimes people -- I

17       don't think you're playing games with me, but I just

18       have to be clear.  You didn't -- you don't have any

19       record or any recollection of any contact with Mike

20       Shelton who was a subcontractor on this project?

21   A   I don't recall any direct contact with him.  I recall

22       some piece of paper with that on -- his name on it, but

23       I don't know if that was my report or -- does that

24       answer your question?

25   Q   I think so.  So you didn't have any direct contact with

1    Mike Shelton?

2  A    Correct.

3  Q    Okay.  Did you do any kind of investigation of Mike

4       Shelton such as call the State Corporations Commission

5       or anything like that?

6  A    Not that I recall.

7  Q    Did you determine whether Mike Shelton was an

8       incorporated business or sole proprietorship or some

9       other type of operating entity?

10          MS. FARLEY:  Could we have his other report to

11  see if that.....

12  A    Yeah.

13          MS. FARLEY:  .....refreshes his memory?

14          MR. COOK:  Oh, I'm sorry.

15  Q    (By Mr. Cook)  That's the August -- here's the August

16       30 report.

17  A    Okay.  I'm sorry, what was your question again?

18  Q    Did you make any determination whether Mike Shelton was

19       operating as a corporate entity or a sole

20       proprietorship or any other type of operating entity?

21  A    It doesn't appear I verified that either way.

22  Q    Okay.  Did you find any information that would reveal

23       to you that Shelton was anything other than a

24       subcontractor?

25          MR. GUIDI:  Object to the form of the question.

1   A       Not -- I mean it's not indicated in my report.

2   Q       (By Mr. Cook)  Okay.  Did anyone that you communicated

3           with during your investigation ever refer to Shelton as

4           an independent contractor?

5               MS. FARLEY:  Can he have the information from

6   the insured?

7               MR. GUIDI:  Yeah.  There are a lot of

8   attachments.  I mean.....

9               MR. BRACKEN:  I don't know what that could be.

10              MS. FARLEY:  There was an August letter with

11  attachments.

12              MR. BRACKEN:  Oh, yes, you're right.  Okay,

13  right.  That's 0021.

14              MS. FARLEY:  I don't know what it says but it

15  could (indiscernible - laugh).....

16              MR. BRACKEN:  Yeah, there's a reference to a

17  list of subcontractors in that area (ph).

18  A       Subcontractor list.  (Pause)  Okay.  I'm sorry.  What

19  was the last question again?

20  Q       Okay.  I knew that was coming.

21  A       I just.....

22  Q       I'm kind of -- trying to recall exactly what I asked.

23          Did anyone that you communicated with during your

24          investigation ever refer to Shelton as an independent

25          contractor?

56

```
 1  A    Not that I'm aware of at the moment.  I mean in
 2       reviewing this.
 3  Q    So just to be clear, you don't recall and from your
 4       review of your notes you cannot find any reference that
 5       anyone ever called Shelton an independent contractor?
 6  A    At this time I would agree with that fumbling through
 7       these papers.
 8  Q    Did you discuss with anyone the degree of control that
 9       Dean Bruington exercised over Mike Shelton?
10  A    I don't recall getting the opportunity or getting --
11       getting that information.
12  Q    Okay.  In your reports to First Financial did you
13       inform them that subcontractor Shelton was
14       incorporated?
15            MR. GUIDI:  I'm going to object to the form of
16  the question?
17  A    This one?  Your question is if I advised them if he was
18       incorporated?
19  Q    (By Mr. Cook)  Let me rephrase the question.  In your
20       reports to First Financial.....
21  A    Uh-hum.
22  Q    .....did you inform them that Mike Shelton was an
23       incorporated entity?
24  A    I don't not see that in here.....
25  Q    Okay.
```

1    A      .....no.

2    Q      In your reports to First Financial did you inform them

3           that Mike Shelton had his own insurance?

4    A      I don't see any statement regarding his insurance

5           status in this report.

6    Q      In your reports to First Financial did you inform them

7           that Mike Shelton paid his own employee taxes?

8    A      I don't see that in my report.

9    Q      In your reports to First Financial did you inform them

10          of anything that would indicate that Mike Shelton was

11          an independent contractor?

12              MR. GUIDI:  Object to the form of the question.

13   A      Your question was anything other than an independent

14          contractor or an independent contractor?

15   Q      (By Mr. Cook)  Let me rephrase just so that.....

16   A      Okay.

17   Q      .....we're on the same wave length.

18   A      Okay.

19   Q      In your reports to First Financial.....

20   A      Uh-hum.

21   Q      .....did you inform them of anything that would

22          indicate that Mike Shelton was an independent

23          contractor?

24              MR. GUIDI:  I think I object on foundation and

25   form.

1    A    I guess my reports indicates that M. Shelton Services

2        completed excavation work.  And then it confirms that I

3        was advised no subcontractor agreements or contracts

4        were completed.  That's kind of the extent of.....

5    Q    (By Mr. Cook)  Would you -- let me think of how to

6        phrase the question.  From what you reported to First

7        Financial did that information indicate whether Mike

8        Shelton was an independent contractor?

9    A    Really I don't think I can tell from -- I mean the --

10       he could be acting in that capacity, I mean based on --

11       I have no direct contact with M. Shelton Services or

12       documentation to, I guess, define their relationship.

13   Q    Let me see if I can cut to the chase.

14   A    Okay.

15   Q    You really didn't do any kind of investigation as to

16       the status of whether Mike Shelton was an independent

17       contractor or not, is that accurate?

18   A    Not exactly.  I made requests for contract agreements

19       between the insured and anybody that worked on the

20       project so I wouldn't -- I wouldn't classify that as no

21       investigation.

22   Q    Were you asked to investigate whether Mike Shelton was

23       an independent contractor?

24   A    By the insurance carrier?

25   Q    Yes.

1   A    I don't believe so.

2   Q    Would you have investigated on your own whether Mike

3        Shelton was an independent contractor?

4   A    If I was involved further you mean or.....

5   Q    No, per.....

6   A    .....I mean I.....

7   Q    .....your the -- per your report what you actually did,

8        did you do any investigation as to his status as an

9        independent contractor?

10            MR. GUIDI:  Object, it's been asked and

11  answered.

12  A    I would -- I would say that from this report and this

13       documentation here it does not appear that I spoke with

14       Mr. Shelton or M. Shelton Services and it looks like

15       the extent of the investigation in that avenue is --

16       was a request for contract and agreement information.

17  Q    (By Mr. Cook)  As far as any other subcontractors on

18       the construction contract for the home.....

19  A    Uh-hum.

20  Q    .....did you investigate their status as to whether

21       they were independent contractors or not?

22  A    I don't recall doing that.

23  Q    And your log notes don't suggest that you did that?

24  A    It does not appear based on review of my logs that

25       there was any phone calls, but -- to the

60

1    subcontractors.  I cannot tell looking at this log what

2    the letter to the insured requested.  It says outline

3    and listed items necessary.  Requested due to non-

4    responsive phone contact attempts. So I mean I don't

5    have that letter in front of me as far as what I

6    requested.

7  Q    In your -- in the reports that you made to First

8    Financial did you come to any conclusion regarding

9    whether any of the subcontractors were independent

10    contractors?

11  A    Looking at my report it does not appear there's any

12    conclusions.

13  Q    As to?

14  A    By myself as to whether they are or are not independent

15    contractors or subcontractors.

16  Q    You prepared -- there were two reports made to First

17    Financial Insurance as a result of the investigation,

18    one dated July 30, 2002, one dated August 30, 2002, is

19    that correct?

20  A    It looks like August 30, 2002, July 24, 2002.

21          MS. FARLEY:  That's to the insured.

22  A    Oh, I'm sorry. Yep, you're correct.  Get my stacks

23    right here.

24  Q    (By Mr. Cook)  Did you communicate your findings to

25    First Financial by any other means aside from these two

1          reports?

2   A      Should be either these reports and any listed

3          attachments.

4   Q      Okay.

5   A      Or enclosures.

6   Q      Is there any reason that you know of that F- -- that

7          First Financial would not rely on and believe your

8          reports?

9               MR. GUIDI:  There's a double negative there so

10  I don't follow the question.  I'll object on form and

11  foundation.

12              MR. COOK:  Let me see if I can take out a

13  negative.  I didn't think there was a double in there, but.....

14  Q      (By Mr. Cook)  Is there any reason that First Financial

15         would not rely on -- on your reports?

16  A      Not that I'm aware of.

17  Q      Is there any reason that First Financial would not

18         believe your reports?

19  A      Not that I'm aware of.

20  Q      Does your report dated July 30, 2002 list the date of

21         loss as 10/30/99?

22  A      It does list the date of loss as 10/30 1999 on the

23         cover -- first page.

24  Q      Does your report to First Financial dated August 30,

25         2000 list the date of loss as 10/30/99?

1  A    Yes.

2  Q    Was the date of loss 10/30/99 a typographical error?

3  A    Not that I'm aware of.

4  Q    Did you send anything to First Financial that told them

5      that 10/30/99 was not the date of loss?

6  A    Not that I'm aware of.

7  Q    In the closing report to First Financial dated August

8      30, 2002 under the heading occurrence is there any date

9      listed as to the date of occurrence or date of loss?

10  A    Could you repeat your question now?

11  Q    In the closing report to First Financial dated August

12      30 under the heading occurrence.....

13  A    Uh-hum.

14  Q    .....is there any date listed as to the date of

15      occurrence or date of loss?

16  A    I don't see another date with the heading of date of

17      loss.....

18  Q    Okay.

19  A    .....in that.

20  Q    And this is for my own edification.....

21  A    Uh-hum.

22  Q    .....is the date of loss and time of occurrence

23      synonymous terms, do they mean the same thing?

24  A    In general?

25  Q    Yeah.

1   A       Typically.

2   Q       Okay.  I heard these terms used.....

3   A       Uh-hum.

4   Q       .....back and forth and I just want to be sure they're

5           -- when I say one both mean the same thing.  I mean

6           we're agreeing on that?

7   A       Typically, yes.

8   Q       Okay.

9   A       I mean it could have an occasion where they don't mean

10          the same thing, but.....

11  Q       I -- what exactly does date of loss mean?

12  A       Specific -- typically it's going to mean the date that

13          the damage occurred.....

14  Q       Okay.

15  A       .....with respect to a building.

16  Q       So -- and I don't mean to beat this, but I just want to

17          be sure.  So the time that the damage occurred is the

18          same as the date of loss?  I think that's what you

19          said.  I'm just.....

20  A       Typically.

21  Q       Okay.  In an affidavit that you gave you stated that

22          you arbitrarily adopted 10/30/99 as the date of loss,

23          is that correct?

24              MR. GUIDI:  I'm going to object to the form.

25  He's entitled to see the affidavit.

1  A    Yeah, I believe that would be handy.

2  Q    (By Mr. Cook)  I've got a copy.....

3           MR. COOK:  Is that it?

4           UNIDENTIFIED VOICE:  Yeah.

5  Q    ....of the affidavit.  It was -- this is your affidavit

6       here.

7           MR. BRACKEN:  The bottom of the second page is

8  what he's talking about.

9  A    Okay.  And your -- could you repeat your question

10      again?

11 Q    In the affidavit that you gave you said that you

12      arbitrarily adopted 10/30/99 as the date of loss, is

13      that correct?

14 A    I utilized October 30, '99 as the date of loss based on

15      communications with Mr. Lutz.

16 Q    Is the date of loss important in an insurance claim?

17 A    Typically.

18 Q    If the date of loss is important why would you

19      arbitrarily adopt a date?

20 A    The date of loss sometimes -- I mean you re- -- it

21      requires more information to get an accurate date of

22      loss.  The reporting format on our reports the date of

23      loss is -- is a field that requires something.  So if

24      there's no date of loss on assignment we would gather

25      information to get based on that time the best

1       information what the appropriate date of loss would be.

2       And if this actually was attached to the fax generally

3       this section right here, date of occurrence, is the

4       date we use.

5  Q   Well, when you say this the ACORD?

6  A   Uh-hum.  (Affirmative)

7  Q   So that -- I guess I'm asking -- no, I'm not asking.  I

8       guess I'm not clear, let me ask the question again.

9       You said that the date of loss is important in an

10      insurance claim, is that right?

11  A   I said typically.

12  Q   In this claim would it be important?

13  A   I would think so.

14  Q   If it's an important element in the claim why would you

15      arbitrarily adopt a date?

16  A   I don't know that I would use the word arbitrarily, but

17      I utilized the date based on the information that I

18      have.  And if we can't confirm that it's incorrect by

19      some information then on my reports that's going to

20      stay that way until it's -- some information is

21      obtained that shows it's incorrect.

22  Q   Okay.  So as far as you know 10/30/99 is a correct date

23      for date of loss?

24  A   At that particular time it apparently was.

25  Q   When you say at that particular time....

1    A    When I did this.....

2    Q    .....when you drafted the report?

3    A    Yes.

4    Q    Okay.  Has it changed any since then?

5    A    Oh, I have --.....

6            MR. GUIDI:  Lack of foundation.

7    A    I have no idea.

8    Q    (By Mr. Cook)  Well, I'm -- you said it was the correct

9        date when you drafted the reports?

10   A    Uh-hum.  (Affirmative)

11   Q    Do you have any information at this point that would

12       change your opinion of the date of loss?

13   A    No, I have no information past August 28, 2002 when

14       I.....

15   Q    Okay.  That's all I wanted.  And that's all I'm trying

16       to.....

17           MR. COOK:  Oops, sorry.  Off record for a

18   moment.

19       (Off record)

20       (On record)

21   Q    (By Mr. Cook)  I just wanted to chat with you for a

22       second about the reservation of rights letter that you

23       sent.  The reservation of rights letter listed the date

24       of loss as 10/30/99, is that correct?

25   A    Correct.

67

1  Q    Did you send any communication to Dean Bruington that

2        informed him that 10/30/99 was not the date of loss?

3  A    Outside of this correspondence?

4  Q    Yes.

5  A    Not that I'm aware of.

6  Q    Is there any reason that Dean Bruington should not have

7        relied on the reservation of rights letter listing the

8        date of loss as 10/30/99 as being inaccurate?

9            MR. GUIDI:   Object to the form.

10  Q    (By Mr. Cook)   Sorry, I -- that question got long.   Is

11        there any reason that Dean Bruington shouldn't have

12        relied on the reservation of rights letter that you

13        sent?

14  A    Not that I'm aware of.

15  Q    Okay.   When you investigated the claim did you have a

16        copy of the First Financial policy issued to Dean

17        Bruington?

18  A    Okay.   I'm sorry, could you repeat that?

19  Q    Did you have a copy of the insurance policy that First

20        Financial issued to Dean Bruington when you were

21        investigating the claim?

22  A    It appears as though -- well, I'll say I have a log

23        entry here of 7/19 it says reviewed commercial policy

24        with endorsements.

25  Q    So you would have been aware of the policy provisions

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | and exclusions in that policy?                               |
| 2  | A | I believe so.                                                |
| 3  | Q | And are you aware that Alaska Court decisions affect         |
| 4  |   | the applications of those exclusions and policy             |
| 5  |   | provisions?                                                  |
| 6  | A | That they affect, is that.....                              |
| 7  | Q | Yes.                                                         |
| 8  | A | Yes.                                                         |
| 9  | Q | And what training have you had in Alaska law?               |
| 10 | A | Primarily insurance type courses, seminars, seminars        |
| 11 |   | with attorneys' offices over the last probably 11           |
| 12 |   | years.                                                       |
| 13 | Q | And how often do you have these type seminars, is it        |
| 14 |   | annually, semi-annually?                                     |
| 15 | A | Probably with attorneys probably every year or three.       |
| 16 | Q | Every year.  And this is Alaska specific or in general?     |
| 17 | A | It would be Alaska specific.                                |
| 18 | Q | Okay.  So you keep yourself more or less up to date on      |
| 19 |   | decisions that affect the handling of exclusions and        |
| 20 |   | policy provisions?                                           |
| 21 | A | I try to.                                                    |
| 22 | Q | Okay.  On the work -- on the new loss assignment, we've     |
| 23 |   | talked about this before, this is FFIC 0148.....            |
| 24 | A | Okay.                                                        |
| 25 |   | MR. BRACKEN:  There's a copy.                               |

1  Q        .....I think you have a copy.

2  A        Yes.

3  Q        The one that was marked, yeah.

4              MS. FARLEY:  You do somewhere else, I think.

5  A        Okay.

6              MS. FARLEY:  If we can just look at yours.

7              MR. COOK:  Yeah, we can share.

8              MS. FARLEY:  Okay.

9  Q        (By Mr. Cook)  In the second -- in the first paragraph

10            under special instructions it says quote, the work

11            product exclusions from form CG double --

12            000010196.....

13 A        Uh-hum.

14 Q        .....I think I got those numbers right.

15            MR. BRACKEN:  (Indiscernible - away from

16 microphone).

17 Q        What is the work product exclusion?

18 A        Do you want me to read it from the policy form?

19 Q        I have got a copy.....

20            MR. BRACKEN:  (Indiscernible - away from

21 microphone).

22            MR. COOK:  Oh.

23            MR. BRACKEN  It'll take me a second to find it.

24 Q        This is -- do you want -- I think you have the whole

25            copy of the insurance policy here.  Here's part of it,

1          damage to your work.  But I guess I'm asking you did

2          you quote the work product exclusion?

3  A      This actually is not all of it, but that's.....

4               MR. BRACKEN:  (Indiscernible - away from

5  microphone).....

6               MS. FARLEY:  Do you have the page right before

7  that one?

8               MR. BRACKEN:  Yeah.

9               MR. COOK:  We've got.....

10             UNIDENTIFIED VOICE:  3.

11             MR. COOK:  .....3 of 13.

12             MS. FARLEY:  No.

13             MR. COOK:  Here's the whole policy.

14  Q      (By Mr. Cook)  I'm going to give you the whole policy

15          'cause it.....

16  A      Okay.  Okay.  I believe I -- I have the primary form

17          here.....

18  Q      Okay.

19  A      .....of the policy.  Not endorsements and not fun

20          stuff, that's.....

21  Q      Okay.

22  A      And your question again was?

23  Q      In the new loss assignment.....

24  A      Uh-hum.

25  Q      .....they ask you to quote the work product exclusion

1    in the re- -- in the letter of reservation of rights.

2    Did you quote the work product exclusion in the

3    reservation of rights letter?

4 A  There is exclusion subsections that include your work.

5 Q  So I'm -- are you finished?  I wasn't sure whether you

6    were finished.

7 A  No, I'm still looking.  Do you want more of an answer

8    or.....

9 Q  I guess the question is did you quote the work product

10    exclusion in the reservation of rights letter?

11 A  I quote subsections that include your product, your

12    work, I believe the quoted work product is actually

13    misquoted.

14 Q  I'm sorry, what do you mean it's misquoted?

15 A  Well, he's got work product in quotes on the

16    assignment.  The sections that include exclusionary

17    language or limiting coverage language for property

18    damage it references those types of issues or actually

19    not titled work product.  It's work -- your work,

20    property damage to your work -- where's the other one,

21    your product.

22 Q  So in the reservation of rights letter what did you

23    quote to Mr. Bruington?

24 A  Exclusion subsection B, number 2 exclusion subsection

25    B.  Is -- you don't need me to read the whole thing, do

1       you?

2   Q   What is it titled?

3   A   Contractual liability.

4   Q   Okay.  And it's section B?

5   A   That's B, that's 2B.

6   Q   And you quoted that whole section to him?

7   A   Number 2 coverage exclusions, subsection B, comma, J5

8       damage to property, J6, K, which is damage to your

9       product, L damage to your work, and N recall products

10      work or impairment -- or impaired property.

11  Q   So it was J5, J6, K -- I'm sorry, I missed.....

12  A   B, J5, J6, K, L and N.

13  Q   Okay.

14  A   And other work product and/or contractual liability

15      sections of the policy not yet identified as related to

16      this loss.

17  Q   So let's just go through those real quickly.  What is

18      the J5 exclusion then?

19  A   J5 damage to property, property damage to that

20      particular part of real property upon which you and --

21      you or any contractors or subcontractors working

22      directly or indirectly on behalf or performing

23      operations if the property damage arises out of those

24      operations or J6.

25  Q   So what -- can you explain what that means in lay

1    terms?

        MS. FARLEY:  Objection.....

2

3  A    Yeah.

        MS. FARLEY:  .....to the extent it suggests

4  it's not lay terms, but are you asking him to give a policy

5

6  interpretation?

        MR. COOK:  I don't know what I'm asking.

7

        MS. FARLEY:  Okay.  We don't either.

8

9  (Whispered conversation)

10  Q    (By Mr. Cook)  I guess really I'm going to try to focus

11  this a little bit. Under your product what does your

12  product refer to?

13  A    And your product, you're referencing K?

14  Q    Yes.

15  A    Property damage as defined in the policy to your

16  product also defined in the policy, arising out of it

17  or any part of it.

        MR. BRACKEN:  (Indiscernible) definition.

18

19  Q    And -- yeah, let's just go to definition. What --

20  define what those are?

21  A    Property damage means A, physical injury to tangible

22  property including all resulting loss of use of that

23  property.  All such loss of use shall be deemed to

24  occur at the time of the physical injury that caused

25  it, or, B, loss of use of tangible property that is not

74

1    physically injured.  All such loss of use shall be

2    deemed to occur at the time of the occurrence, further

3    defined by definition, that caused it.  That's property

4    damage.  Do you want me to read those....

5  Q    How about your product?

6  A    Your product includes A, warranties, representations

7    made at any time with respect to the fitness, quality,

8    durability, performance or use of your product.  And,

9    B, the providing of or failure to provide warnings or

10    instructions.  Your product does not include vending

11    machines or other property rented to or located for the

12    use of others but not sold.

13         MR. BRACKEN:  (Indiscernible - away from

14  microphone).

15         MR. COOK:  Yeah, let's go off record for a

16  minute.

17    (Off record)

18    (On record)

19  Q    (By Mr. Cook)  While we were off record you indicated

20    you had missed a paragraph when we were going through

21    the definitions.  Let's talk about the your product

22    definition again, please.

23  A    Your product is defined as -- your product means A, any

24    goods or products other than real property,

25    manufactured, sold, handled, distributed or disposed of

1          by 1, you; 2 others trading under your name, or a

2          person or organization whose business or assets you

3          have acquired, and B, containers other than vehicles,

4          materials. parts or equipment furnished in connection

5          with such goods or products.

6  Q    Okay.  Is the Lutz house real property?

7  A    Is -- you're asking me if their house is real property?

8  Q    Yes.

9  A    Yes.

10  Q    So that would not fit the definition of your product,

11         would it not?

12          MR. GUIDI:  Object on form and foundation.

13          MS. FARLEY:  Object, calls for a legal

14  conclusion.  You can answer if you can.

15  A    Well.....

16  Q    (By Mr. Cook)  Are you familiar with the 1999 decision

17         in Fay Hayes (ph) v. Alaska Insurance Company?

18  A    No.

19  Q    Are you aware that the court has specifically addressed

20         the question of whether a house can be excluded under

21         coverage under the your work -- your work product

22         exclusion?

23  A    Your -- your question is am I aware of that?

24  Q    Yes.

25  A    I'm not aware of that specific decision either --

1    either way.

2  Q    Let me ask that question a little differently.  I don't

3    know what we got where -- a clear answer.  Are you

4    aware that under the holdings of the Alaska Supreme

5    Court that a house can be excluded from coverage under

6    the your work product exclusion?

7           MR. BRACKEN:  Actually, Tim there's a no in

8  there (indiscernible - away from microphone).

9           MR. COOK:  I was thinking I missed a not in

10  there.  Let me try that again.  I'm sorry.

11  A    I'm thoroughly confused now.

12           MR. COOK:  I'm not good at ad lib here

13  particularly when I'm confused.

14  Q    (By Mr. Cook)  Under Alaska law are you aware that a

15    house cannot be excluded from coverage under the your

16    work exclusion?

17           MR. BRACKEN:  And under your product exclusion.

18           MS. FARLEY:  Object to the form.  Are you aware

19  of that law?

20  A    No, I'm not.

21  Q    Okay.  Did you ever review the First Financial claims

22    manual?

23  A    No.

24  Q    Were you aware that First Financial had a claims

25    manual?

```
1   A        No.
2   Q        Okay.  Are you aware that Umialik Insurance paid a
3            claim to Mr. Lutz as a result of damage to his home?
4   A        No.
5   Q        Have you ever reviewed any files at Umialik with regard
6            to Mr. Lutz' claim that he had?
7   A        No.
8                    MR. COOK:  I think that's all we've got.
9                    MS. FARLEY:  Good thing those papers are Bate
10  stamped.
11                   MR. COOK:  Yeah.
12                   MR. BRACKEN:  The claims manual we received
13  from ya'll has an appendix listed that we didn't.....
14                   MR. COOK:  We're off record.  Hold on. I'm
15  sorry.
16           (Off record)
17                                (Deposition Exhibit 2 marked)
18           (On record)
19                      CROSS EXAMINATION
20  BY MR. GUIDI:
21  Q        Can you identify Exhibit number 2, Mr. Buness?
22  A        It appears to be a certified mail receipt and a copy of
23           the card.
24  Q        Does that receipt relate to your reservation of rights
25           letter?  In other words is it the receipt for the
```

1 transmittal of your reservation of rights letter that

2 was marked as Exhibit 1 in this case -- in this

3 deposition?

4 A    It appears to be.

5            MR. GUIDI:  Thank you.  That's all I have.

6       MR. COOK:  Okay.

7            (END OF PROCEEDINGS)

8                 *  *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         S I G N A T U R E

2    UNITED STATES OF AMERICA          )
                                       )ss.
3    STATE OF ALASKA                   )

4                 I, **DAVID D. BUNESS**, having read the foregoing

5    deposition testimony, do hereby certify it to be true and

6    accurate, subject to corrections, if any, as indicated on the

7    attached errata sheet.

8                                 _____

                                  DAVID D. BUNESS
9                                 DATE:_____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            C E R T I F I C A T E

2  UNITED STATES OF AMERICA)
                          )ss.
3  STATE OF ALASKA        )

4          I, Rebecca Nelms, Notary Public in and for the State of
   Alaska, and Reporter for R & R Court Reporters, Inc., do hereby
5  certify:

6          THAT the annexed and foregoing Deposition of **DAVID D.**
   **BUNESS** was taken before Lynn Hall on the 16th day of February,
7  2006, commencing at the hour of 1:00 o'clock p.m. at the
   offices of R & R Court Reporters, 810 N Street, Anchorage,
8  Alaska, pursuant to Notice to take said Deposition of said
   Witness on behalf of Plaintiff;

9
           THAT the above-named witness, before examination, was
10 duly sworn to testify to the truth, the whole truth and nothing
   but the truth;

11
           THAT this Deposition, has heretofore annexed, is a true
12 and correct transcription of the testimony of said Witness,
   taken by Lynn Hall and thereafter transcribed by myself;

13
           THAT the original of the Deposition will be loaded in a
14 sealed envelope, with the attorney requesting transcription of
   same, as required by Civil Rule 30(f)(1) amended, that being:
15 MR.  TIM COOK, Attorney at Law, 3901 Taiga Drive, Anchorage,
   Alaska 99516;

16
           THAT I am not a relative, employee or attorney of any
17 of the parties, nor am I financially interest in this action.

18         IN WITNESS WHEREOF, I have hereunto set my hand and
   affixed my seal this 28th day of February 2006.

19                      _Rebecca Nelms_
                        _____
20                      Notary Public in and for Alaska
                        My Commission expires:10/10/06

21

22

23

24

25